# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-20113

United States Court of Appeals
Fifth Circuit

**FILED**

December 27, 2018

Lyle W. Cayce
Clerk

FLORA NALL, as Personal Representative of
the Estate of Michael Nall, substituted in place
and stead of Michael Nall, deceased,

> Plaintiff – Appellant,

v.

BNSF RAILWAY COMPANY,

> Defendant – Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before ELROD, COSTA, and HO, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Michael Nall sued his employer, BNSF Railway Company, for disability discrimination and retaliation after he was diagnosed with Parkinson's disease and later placed on medical leave by BNSF. Because there is a fact issue as to whether BNSF discriminated against Nall, we REVERSE the grant of summary judgment to BNSF on Nall's disability discrimination claim and REMAND for further proceedings. Because Nall fails to identify a material fact issue regarding his retaliation claim, we AFFIRM the district court's judgment on this claim.

No. 17-20113

## I.

Nall started working as a trainman with BNSF in 1973. In 2010, he was diagnosed with Parkinson's disease. At this time, BNSF provided Nall and his doctor with a medical status form listing the job duties of a trainman, including items such as operating track switches, applying and releasing hand brakes, monitoring track conditions, inspecting train cars and equipment, relaying various types of signals, and controlling train speed. After Nall's neurologist cleared him to continue working, BNSF's doctor revised the form to instead contain a list of switchman duties different from the trainman duties on the previous form. The new list added items such as "mak[ing] quick hand and leg movements," "rid[ing] on moving cars while holding onto a ladder," and "maintaining good balance and steadiness of stance/gait."

Nall continued to work with BNSF for the next year and a half without incident. Then, in 2012, BNSF gave Nall a letter stating that a co-worker had voiced concern about Nall's ability to safely perform his job duties. Nall was placed on medical leave and required to obtain a release from the BNSF medical department to return to work.

To begin the evaluation process, BNSF requested a copy of the results of a physical examination from Nall's neurologist that would show the doctor's awareness of BNSF's concerns and the results of any diagnostic tests performed. Nall complied. He submitted to BNSF a report from his neurologist recommending further evaluations by a neuropsychologist and a physical therapist. BNSF requested that Nall complete these evaluations. Nall again complied. The neuropsychologist reported that he did not see any evidence of brain damage after evaluating Nall and placed Nall's skill level at the low end of the average range. The occupational therapist concluded that Nall was able to meet the demands of his position at BNSF; suggested that

2

Nall be cautious with balance situations; and added that Nall was able to perform balance tasks safely.

BNSF found some of the statements in these reports "concerning" and kept Nall on leave. BNSF emphasized that its rail yard employees "need[ ] to be able to make quick decisions and take quick actions in order to work safely" and that "[b]alance is essential to working safely as a brakeman/switchman/conductor." In addition, BNSF provided Nall with five pages of photographs depicting some of his job duties and asked for his neurologist to review them and return a statement to BNSF regarding Nall's ability to complete the depicted tasks.

Dr. Joseph Jankovic, a neurologist and the director of the Parkinson's Disease Center and Movement Disorders Clinic at the Baylor College of Medicine, reviewed the photographs. He concluded that Nall was able to perform the job duties shown in the photographs safely and was "in very good condition with balance and concentration in order." BNSF next requested that Nall perform a field test. During the test, Nall successfully completed all of the requested tasks, including taking instructions via radio, climbing on and off equipment, and walking on uneven surfaces. The physical therapist who conducted the test wrote a report in which he noted that Nall had decreased balance when reaching, a resting tremor, and slow and jerky movement patterns. Although not mentioned in the report, two BNSF employees later testified in depositions that, during the test, Nall engaged in conduct that violated two of BNSF's "eight deadly decisions"—BNSF's most serious safety rules. BNSF informed Nall that, based on the results of the field test, he could not return to work.

A few months later, Nall filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC). He also sent a new medical status form to BNSF showing that he could safely return to work. BNSF

responded that Nall was unable to return to work because of his field test results. Nall sent another medical status form to BNSF, from another doctor, clearing him to return to work, and a new BNSF doctor, Dr. Laura Gillis, responded by classifying him as "permanently medically disqualified." The EEOC concluded its investigation and sent a letter to BNSF stating that it did not agree with BNSF that Nall was a potential harm to himself or others or that he was incapable of doing his job. Indeed, the EEOC investigator concluded that there was a violation of the Americans with Disabilities Act (ADA).

Nall and his wife filed the instant lawsuit. During the litigation process, Nall kept trying to return to work. BNSF conducted a second field test and found that Nall was still unable to perform his job duties safely. Several months later, Nall submitted records to BNSF showing that his neuropsychological testing results were "essentially the same as they were in 2012." BNSF's decision remained the same.

Against BNSF, Nall alleged disability discrimination and retaliation under the ADA and Texas Commission on Human Rights Act (TCHRA).[1] BNSF maintains that it did not discriminate against Nall because Nall was unsafe to return to work throughout the relevant time period. The district court held that Nall presented no direct evidence of discrimination, was not qualified for his position as a trainman, failed to present evidence of pretext, and was precluded from succeeding on his claims because BNSF is entitled to a "direct threat" defense. Nall timely appealed.

---

[1] Nall also alleged age discrimination and brought a retaliation claim under the Age Discrimination in Employment Act (ADEA). However, on appeal, Nall states that he "no longer wishes to pursue his age discrimination claims." Thus, he has waived any arguments under the ADEA. *See United States v. Conn*, 657 F.3d 280, 286 (5th Cir. 2011) ("'[W]aiver is the intentional relinquishment of a known right,' and 'waived errors are entirely unreviewable.'" (quoting *United States v. Arviso-Mata*, 442 F.3d 382, 384 (5th Cir. 2006))).

No. 17-20113

II.

We review *de novo* a district court's grant of summary judgment, viewing all facts and evidence in the light most favorable to the nonmoving party. *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016). "Summary judgment is only appropriate if the movant has shown that there is no genuine issue as to any material fact such that the movant is entitled to judgment as a matter of law." *Id.*

"An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant. In reviewing the evidence, we must draw all reasonable inferences in favor of the nonmoving party, and avoid credibility determinations and weighing of the evidence. In so doing, we must disregard all evidence favorable to the moving party that the jury is not required to believe." *Sandstad v. CB Ricard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002) (citations omitted).

III.

"In employment discrimination cases, a plaintiff may present his case by direct or circumstantial evidence, or both."[2] *Id.* If the plaintiff produces direct evidence that discriminatory animus played a role in the employer's adverse employment decision, the burden of persuasion shifts to the defendant who must prove that it would have taken the same action despite any discriminatory animus. *Id.* If the plaintiff only produces circumstantial evidence of discrimination, the well-known burden-shifting analysis set forth

---

[2] "Because TCHRA 'parallels the language of the ADA,' Texas courts follow ADA law in evaluating TCHRA discrimination claims." *Williams v. Tarrant Cty. Coll. Dist.*, 717 F. App'x 440, 444–45 (5th Cir. 2018) (quoting *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285–87 (5th Cir. 2004)). Except where we have noted otherwise, the following ADA analysis therefore applies equally to Nall's claims under the TCHRA. *See id.*

No. 17-20113

in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), guides our inquiry. *Id.* The district court held that Nall neither presented direct evidence of discrimination nor satisfied the circumstantial-evidence requirements of *McDonnell Douglas*. We address both determinations.

A.

On appeal, Nall presents several comments by BNSF employees as direct evidence of discrimination. First, right after the initial field test, Dana Dickey, the BNSF field medical manager, allegedly told Nall that Nall was "never coming back to work" and that "they were just sending [him] paper work . . . to—you know, be nice." Second, Dr. Gillis and BNSF's manager of clinical services, Carol Wilks, allegedly told Nall's wife that "people with Parkinson's don't get better." Third, Dickey e-mailed Dr. Gillis regarding Nall's condition and whether BNSF should offer him a second field test and said that they "have to have it all documented." In response, Dr. Gillis noted that there was a low likelihood that Nall's situation would improve but that they have to ask the questions. Fourth, despite Nall's submission of several medical status forms indicating his ability to work safely, Dr. Gillis and Dickey repeatedly referenced only the first field test.

The first two statements above—that BNSF was just sending Nall paperwork to "be nice" and that "people with Parkinson's don't get better"— were the only comments presented as direct evidence of discrimination to the district court. As a result, these are the only statements we consider. *See United States v. Mix*, 791 F.3d 603, 611–12 (5th Cir. 2015) (holding that arguments not raised below are forfeited). We agree with the district court that these two statements are insufficient to constitute direct evidence.

If an inference is required for evidence to be probative as to an employer's discriminatory animus, the evidence is circumstantial, not direct. *Sandstad*, 309 F.3d at 897–98. Here, the evidence that Nall provides requires an

inference to be probative as to any discriminatory animus. First, to find that Dickey's comments, said after the field test, are evidence of animus requires the inference that Nall was "never coming back to work" because of Nall's disorder rather than his performance on the field test. Second, Dr. Gillis's and Wilks's statements about people with Parkinson's disease could simply be an observation about the disorder. To be evidence of animus, the comment requires an inference that the irreversible nature of Parkinson's disease was the reason why Nall would not be returning to work. These comments do not constitute direct evidence; they are circumstantial evidence which we may only consider under *McDonnell Douglas*. Having so concluded, we move on to the *McDonnell Douglas* framework.[3]

### B.

Under the *McDonnell Douglas* framework, Nall must first make out a *prima facie* case of discrimination by showing that: (1) he has a disability or was regarded as disabled; (2) he was qualified for the job; and (3) he was subject to an adverse employment decision because of his disability. *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 811 (5th Cir. 2016). If he does, the burden shifts to BNSF to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If BNSF satisfies its burden, the burden shifts back to Nall "to produce evidence from which a jury could conclude that [BNSF's] articulated reason is pretextual." *Cannon*, 813 F.3d at 590.

---

[3] Judge Costa's observation in his concurrence that the *McDonnell Douglas* framework can be inefficient and cumbersome is astute. However, as Judge Costa notes, Nall's attempt to prove his case by direct evidence relied only on comments by his supervisors. Beyond these comments, which we have concluded are not direct evidence, Nall attempted to prove his case using circumstantial evidence. Thus, because Nall presented only circumstantial evidence on summary judgment, it does not appear that we have the liberty to analyze this case in the streamlined manner that Judge Costa describes.

No. 17-20113

Here, the district court concluded that Nall satisfied the first and third elements of a *prima facie* case of discrimination but failed to show the second element—that Nall was qualified for the job of a trainman. That element is the focus of this appeal.

"To be a qualified employee, [Nall] must be able to show that he could either (1) 'perform the essential functions of the job in spite of his disability,' or (2) that 'a reasonable accommodation of his disability would have enabled him to perform the essential functions of his job.'" *Id.* at 592 (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)); *see* 42 U.S.C. § 12111(8). Nall argues that he could perform the essential functions of his job. "A function is 'essential' if it bears 'more than a marginal relationship' to the employee's job." *Cannon*, 813 F.3d at 592 (quoting *Chandler v. City of Dall.*, 2 F.3d 1385, 1393 (5th Cir. 1993), *holding modified on other grounds as discussed in Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir. 2002)). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

In this case, the parties agree that the question of whether Nall was a qualified employee is directly related to the question of whether BNSF is entitled to a "direct threat" defense.[4] An employer is entitled to a direct threat defense if an employee poses a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 731 (5th Cir. 2007) (quoting 42 U.S.C.

---

[4] While the "direct threat" defense controls our analysis of Nall's ADA claims, the TCHRA does not contain analogous statutory language, we have not found any Texas case law discussing the issue, and the parties did not brief it. Accordingly, the district court will need to address this issue on remand.

8

No. 17-20113

§ 12111(3)); *see also* 42 U.S.C. § 12113(b).  Whether an employer has properly determined that a person poses a direct threat depends on "the objective reasonableness of [the employer's] actions." *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ("[C]ourts should assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments[.]").[5]  Thus, the question here is whether the processes used in determining that Nall could not perform the essential duties of a trainman safely were objectively reasonable; or, applying the summary-judgment standard, whether a reasonable jury could conclude that BNSF's actions were not objectively reasonable.[6]

Nall states in his complaint that he worked as a trainman, performing the duties of a conductor, switchman, and brakeman.  According to BNSF, the duties of a conductor include maneuvering on, off, and around railcars, riding on railcars with four points of contact, hand signaling, connecting and disconnecting hoses and railcars, and "throwing" switches.  Moreover, the duties of a switchman include substantially similar tasks, along with the ability "to make quick hand and leg movements" and "maintain[ ] good balance and steadiness of stance/gait."

According to Nall, several of the duties listed by BNSF, specifically those involving quick movements and balance, were not part of his job.  In support,

---

[5] We note that the dissenting opinion acknowledges that we have stated the law correctly.  Our disagreement with that opinion stems from the proper application of the law in this case—specifically, how to evaluate the objective reasonableness of BNSF's actions.

[6] We do not reach the question of which party bears the burden of proof regarding the direct threat defense.  BNSF argues that because the direct threat defense is related to the second element of Nall's *prima facie* case, Nall should have the burden to prove that he could safely do his job.  In *Rizzo v. Children's World Learning Ctrs., Inc.*, 213 F.3d 209 (5th Cir. 2000) (en banc), we declined to reach the question of which party bears the burden of establishing that an individual's disability poses a direct health or safety threat to the disabled employee or others.  213 F.3d at 213 & n.4.  We do so again here.  Even assuming *arguendo* that the burden is Nall's, at this stage, he has satisfied it.

Nall points to a BNSF medical status form provided to Nall and his doctor before the list of switchman duties that includes a more limited set of trainman duties. The medical status form lists the following: operating track switches and derails, using hand brakes, monitoring track conditions and traffic, inspecting railcars and equipment, communicating signals affecting the movement of trains, and controlling the speed and clearance distance of railcars. After Nall's neurologist recommended a release to full duty for Nall based on this medical status form back in 2010, shortly after Nall had been diagnosed, a BNSF doctor provided Nall's doctor with a new list that she said, "addresses the duties for which Parkinson's symptoms may be of issue." In addition, Nall cites to the testimony of BNSF's terminal manager for the yard where Nall worked. The manager testified that it is not essential to work quickly as a conductor, switchman, or brakeman.

A reasonable jury could conclude that BNSF did not act reasonably in its process to determine that Nall could not perform the essential duties of a trainman safely. First is the issue of identifying those essential duties. The district court acknowledged that the job descriptions provided to the court, specifically the original medical status form and the more specific list of switchman duties, contain differences. But the court concluded that these differences do not affect the question of whether Nall was qualified because "the record demonstrated that BNSF repeatedly stated that it deemed performing job tasks safely as essential to Nall's position" and this was also reflected in the original medical status form job description. The question remains, however, what the job tasks were that Nall could allegedly not perform safely.

For our analysis, we take guidance from the ADA's definition of a "qualified individual" and consider the list of trainman duties BNSF originally provided to Nall on the medical status form that they gave to his doctor. *See*

42 U.S.C. § 12111(8) (stating that a written job description shall be considered if it was prepared "before advertising or interviewing applicants for the job"). This list did not include any reference to quick movements, balance, or steadiness. Moreover, BNSF's terminal manager testified that it was not essential to work quickly as a conductor, switchman, or brakeman. *Cf. Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007) ("[W]hen considering the employer's judgment regarding what is an essential function, we have previously considered not only the company's 'official position,' but also testimony from the plaintiff's supervisor."). Taking the evidence in the light most favorable to Nall, the trainman duties listed on the medical status form are the ones we consider. Next, we address the question of whether BNSF's determination that Nall could not safely perform these tasks was objectively reasonable.

We emphasize that our inquiry on the issue of objective reasonableness does not ask whether BNSF's conclusion that Nall could not perform his job duties safely was a reasonable medical judgment. Instead, we ask whether BNSF actually exercised that judgment. In other words, the question on appeal is not whether it was reasonable for BNSF to *conclude* that Parkinson's disease symptoms prevented Nall from safely performing his duties; the question is whether BNSF came to that conclusion via a reasonable *process* that was not, as Nall alleges, manipulated midstream to achieve BNSF's desired result of disqualifying him. More precisely, the question is whether there is any evidence in the record which, if believed, would be sufficient to support a jury finding that BNSF's procedures for evaluating Nall's disability were unreasonable.

In finding that BNSF's *conclusion* on Nall's fitness for work was reasonable, the dissenting opinion assumes an answer to a disputed fact issue—that BNSF's *procedures* were reasonable—and that is the one thing we

are not permitted to do on summary judgment. Under the vision established by Congress, fact issues are tried by juries. *See* Fed. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Seventh Amendment . . . is preserved to the parties inviolate."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). It is not our role as judges to decide fact issues in order to affirm on summary judgment. With that in mind, we review the record for evidence that could create a fact issue on the reasonableness of the process by which BNSF reached its decision to disqualify Nall.

On this question, taking into consideration the reports by Nall's doctors—all of whom concluded that Nall could safely perform the tasks of a trainman listed on the medical status form that BNSF originally provided to Nall—the fact that Nall successfully completed each of the tasks presented to him during his first field test, and the comments made by BNSF employees that Nall was "never coming back to work" and that "people with Parkinson's don't get better," there is a genuine dispute. *See E.I. Du Pont*, 480 F.3d at 728, 731 (holding that judgment as a matter of law on direct threat defense was inappropriate where employee presented evidence she could safely perform essential job function but employer relied on disputed field test); *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 680–81, 683 (5th Cir. 1996) (reversing summary judgment where employer terminated employee for inability to perform essential function not included on lists of essential functions provided to employee and his doctor, and employee introduced evidence that the function was not essential).

The district court held that BNSF was entitled to disregard Dr. Jankovic's medical releases because they "were based on a limited set of observations and 'incomplete set of facts.'" *Hickman v. Exxon Mobile*, 2012 WL

9100358, at *9 (S.D. Tex. Sept. 27, 2012).  Even if it is true that BNSF could choose to credit the opinions of its own doctors over Nall's, the evidence identified by Nall puts into question the objective reasonableness of the process by which BNSF's doctors formed those opinions.

The district court supported its decision with citations to our unpublished opinion in *Hickman v. Exxon Mobil*, 540 F. App'x 277 (5th Cir. 2013).  In that case, the plaintiff, Hickman, argued that her employer, Exxon, failed to conduct an adequate individualized assessment of her abilities to perform her job in support of a direct threat defense because it discounted the opinion of her doctor.  *See Hickman*, 2012 WL 9100358, at *9.  The district court disagreed.  *Id.*  It characterized that doctor's decision as a "last-minute work release" and noted that two of Hickman's previous neurologists had placed work restrictions on her; that she had worked with two neurologists before she found one who would release her to return to work with only a driving restriction; and that the doctor who released her orally agreed with Exxon's doctor that his concerns regarding Hickman returning to work were legitimate.  *Id.*  In a short, unpublished opinion that did not discuss the differing views of these doctors, we affirmed.  *See Hickman*, 540 F. App'x at 277.  This is a completely different case.  And, in any event, we are not bound by *Hickman*.

Here, Nall provided medical reports from numerous doctors concluding that he could perform his job duties safely.[7]  This includes a report from a

---

[7] The dissenting opinion asserts that under the majority's approach, an employee need only find one doctor who disagrees with the employer's conclusion to survive summary judgment.  But the dissent misunderstands our analysis: we reverse the summary judgment not because Nall's doctors and BNSF's doctors disagreed, but because of the presence of disagreeing doctors coupled with the dispute over the first field test, the discrepancies between the job descriptions, and the comments made by BNSF's employees. The totality of the circumstances creates a fact issue as to whether BNSF manipulated the process to guarantee a particular result.

neurologist who said that Nall's "station and gait were not too abnormal"; a report from an occupational therapist who found that Nall "appeared to be able to meet the demands for various positions working for BNSF" and that he could perform balance tasks safely; a memo from Baylor College of Medicine neurologist Dr. Jankovic that he had reviewed BNSF's photographs of Nall's job duties and concluded that he was able to perform his job duties safely; a medical status form completed by Dr. Jankovic stating that Nall was able to return to work without any restrictions; and a medical status form completed by a different doctor stating that Nall was able to return to work without any restrictions.[8]

In addition, and importantly, Nall successfully completed each of the tasks required of him during his first field test. BNSF nonetheless did not reinstate Nall because he committed "[s]everal safety exceptions" during the evaluation, including making the "deadly decision" of going between moving cars, failing to give proper hand signals, and demonstrating unsafe behavior

---

In any event, a similar criticism applies to the approach advocated in the dissenting opinion. If the proper inquiry is into the reasonableness of the employer's *conclusion* about the employee's fitness to work, the employer will win at the summary judgment stage as long as one doctor agrees with the employer's decision. Our approach, in contrast, does not distill summary judgment in these cases into a syllogism under which plugging in the proper premises produces a certain result regardless of the facts. Simply put, facts matter, and we reserve material fact issues for juries.

[8] With respect to timing, Nall argues on appeal that BNSF took adverse actions in: (1) April 2012, when BNSF placed him on medical leave; (2) September 2012, when BNSF informed Nall that he could not return to work; (3) December 2012 through January 2013, when BNSF again said Nall could not return to work; and (4) June through July 2013, when BNSF permanently medically disqualified him. At the district court, however, Nall only argued that he was subjected to an adverse employment decision on the last two of these four dates: December 2012 and June 2013, when Nall submitted information that he was able to return to work without restriction and BNSF still denied his requests. All of the doctor evaluations listed above were provided to BNSF before December 2012, with the exception of the second medical status form, which was sent to BNSF on December 20, 2012. Moreover, because he did not present argument regarding the first two actions to the district court, Nall has forfeited the argument that he was also subject to adverse actions in April and September 2012. *See Mix*, 791 F.3d at 611.

while dismounting equipment.  Later, BNSF also claimed that Nall made a second "deadly decision"—"fouling"  the track, which involves walking on a part of the track that puts you at risk of being hit.  Nall, however, disputes each of these allegations.  With respect to the "deadly decisions," Nall testified that the cars were not moving when he started walking between them, and that he was asked to do something during the test that required him to "foul" the track.  He also testified that he used a radio during the evaluation, not hand signals, and did not agree that he dismounted the railcar in a way that was unsafe.

Finally, Nall provided evidence that BNSF employees made comments that cast doubt on the propriety of BNSF's evaluation process.  Nall testified in his deposition that BNSF's field medical manager told him he was "never coming back to work" and that the company was only asking Nall for updated medical paperwork to "be nice."  In addition, two BNSF employees—a doctor and the manager of clinical services—allegedly told Nall's wife that "people with Parkinson's don't get better."

Viewing the evidence in the light most favorable to Nall, as we must, there is a genuine dispute as to the objective reasonableness of BNSF's actions.[9] *See, e.g.*, *Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080, 1091–92 (10th Cir. 2008) (holding that a triable issue of material fact existed as to whether the employee actually posed a direct threat to workplace safety where there was a question on whether a physical therapist's opinion could be considered objective, evidence indicating that the employee's restrictions may not have limited his ability to perform safely in his environment, and evidence

---

[9] The dissenting opinion is quite correct that our task is not to determine whether BNSF was correct in its ultimate conclusion that Nall was unable to perform his duties safely. A correct conclusion is not required to satisfy the objective reasonableness standard.  What is required, however, is that BNSF comply with its own procedures and not change the disqualification criteria in the middle of the evaluation to dictate a particular outcome.

that his employer's application of various medical judgments to the workplace was unreasonable); *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1030 (9th Cir. 2003) (holding that medical opinion letters from the employee's doctors, together with the employee's own declaration, raised a material fact issue as to the objective reasonableness of the employer's opinion); *Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1309 (11th Cir. 2001) (holding that questions of fact remained as to what the essential functions of the employee's position are, and whether, assuming the disputed function was included, the employee was qualified to perform such work).

The numerous medical reports that cleared Nall to work, the comments made by BNSF employees, and the fact dispute on the "safety exceptions" during Nall's first field test—which BNSF cited as the basis for refusing to reinstate him—are sufficient to create a material fact issue on the question of whether BNSF's evaluation procedures were manipulated midstream in order to produce a certain outcome. As a result, for summary-judgment purposes, Nall has established his *prima facie* case, and we move to the next steps of the *McDonnell Douglas* analysis—asking whether BNSF has articulated a legitimate, nondiscriminatory reason for placing Nall on medical leave and, if so, whether Nall has shown that the articulated reason is pretextual.[10]

---

[10] The district court also concluded that BNSF was entitled to a "business necessity" defense. The "direct threat" defense and the "business necessity" defense "require different types of proof." *EEOC v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000). "Direct threat focuses on the individual employee, examining the specific risk posed by the employee's disability. In contrast, business necessity addresses whether the qualification standard can be justified as an across-the-board requirement." *Id.* (citation omitted). The district court seemed to consider the qualification standard here to be a requirement that Nall could do his job safely. Thus, its analysis regarding the defense mirrored its direct threat analysis. Similarly, BNSF summarily states that the district court's separate rejection of Nall's attack on BNSF's business necessity defense was correct "[f]or the same reasons" given in support of its direct threat defense. Accepting the relevant qualification as the ability to do his job safely, we conclude that Nall has also established a fact issue regarding BNSF's entitlement to the business necessity defense under the ADA.

No. 17-20113

"At summary judgment, evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive." *Diggs v. Burlington N. & Santa Fe Ry. Co.*, 742 F. App'x 1, 4 (5th Cir. 2018) (quoting *LHC Grp.*, 773 F.3d at 702). The district court held that the safety concerns emphasized by BNSF constituted a legitimate, non-discriminatory reason for BNSF to place Nall on medical leave. As we have discussed, however, viewing the evidence in the light most favorable to Nall, BNSF's safety concerns were not tied to Nall's ability to perform the tasks required of his job. He could perform those tasks. Instead, BNSF's concerns were tied to his physical impairment—his Parkinson's symptoms.

Notably, the job requirements that were added by BNSF to those of a trainman reflect abilities directly impacted by Parkinson's disease, such as the ability "to make quick hand and leg movements" and "maintain[ ] good balance and steadiness of stance/gait." This casts doubt on the legitimacy of BNSF's concerns. *See Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) ("An employer's inconsistent explanations for an employment decision 'cast doubt' on the truthfulness of those explanations."); *see also Rizzo v. Children's World Learning Ctrs., Inc.*, 213 F.3d 209, 221 (5th Cir. 2000) (en banc) (Jones, J. and Smith, J., dissenting) ("[W]e may have special cause for suspicion when an employer justifies discrimination not on the relatively concrete and more readily measurable basis of ability to perform a particular essential job function safely, but because of a proffered generalized concern about health and safety.").

---

As with the direct threat defense, however, the district court did not address the applicability of the business necessity defense under the TCHRA, and the parties did not brief it. The district court will need to consider this on remand.

17

No. 17-20113

Additional evidence that suggests that BNSF's explanation is false or unworthy of credence includes the reports by Nall's doctors, who concluded that Nall could safely return to work, the "never coming back to work" and Parkinson's-related statements made by BNSF employees, and the fact that BNSF continued to move the goalposts—to make requests of Nall, even as he completed the previous ones. *Cf. Diggs*, 742 F. App'x at 5 (holding that there was no fact issue regarding pretext when an employee failed to timely submit information requested by his employer, BNSF, and there was "no evidence that the company would create new information demands after [the employee] complied with previous ones").

As a result, even assuming that BNSF's alleged safety concerns were legitimate and non-discriminatory, the totality of the circumstances creates a material fact issue as to whether BNSF's proffered reasons for refusing to reinstate Nall were merely pretextual—that is, that the real reason for BNSF's adverse employment action was Nall's disability. Accordingly, on Nall's disability discrimination claims, we reverse the district court's judgment. Of course, this holding does not mean that Nall will prevail at trial or that safety was not the real reason for BNSF's decision. It means only that Nall produced enough evidence to survive summary judgment.

IV.

"To show an unlawful retaliation, a plaintiff must establish a *prima facie* case of (1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action. Once the plaintiff has established a *prima facie* case, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action. If such a reason is advanced, the plaintiff must adduce sufficient evidence that the proffered reason is a pretext for retaliation. Ultimately, the employee must show that 'but for' the protected

activity, the adverse employment action would not have occurred." *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (footnotes omitted); *see also Feist v. La. Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).

Here, Nall claims that the "causal link" element of his *prima facie* case is the only element in dispute. "A 'causal link' is established when the evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.'" *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) (quoting *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998)).

Nall satisfies the first element of his retaliation claim by pointing to his decision to file a complaint with the EEOC in December 2012. For the second element, Nall notes that "BNSF consistently refused to reinstate him after that date, including only three weeks later on January 8, 2013." As to the third element, Nall argues that Dr. Gillis and Dickey were aware of Nall's EEOC complaint because they admit that they provided information to the EEOC through another BNSF employee. Nall argues that there is a fact issue on this element because of how burdensome BNSF made the process for Nall to be considered "qualified" and misrepresentations BNSF made to the EEOC, including the fact that BNSF said it had not received additional information from Nall during a certain time period when it had.

Nall does not provide sufficient evidence to support the "causal link" element of his retaliation claim. Although Nall sets forth some evidence to show that Dr. Gillis and Dickey, individuals involved in the decision-making process regarding Nall, eventually learned that Nall had filed a claim with the EEOC, he does not cite to any evidence that demonstrates that the subsequent decisions to keep him on leave were at all based on this knowledge. Without evidence of a causal link between the filing of his EEOC claim and his

No. 17-20113

continued placement on medical leave, Nall is unable to establish a *prima facie* case of an unlawful retaliation and his retaliation claims necessarily fail.

## V.

For the above reasons, we REVERSE the grant of summary judgment as to Nall's disability discrimination claims and AFFIRM the judgment as to the remaining claims. This case is REMANDED for further proceedings consistent with this opinion.

No. 17-20113

GREGG COSTA, Circuit Judge, specially concurring:

The dissenting opinion reminds me of the baseball player who said, "They should move back first base a step to eliminate all those close plays."[1] Of course, there would still be close plays if the base were farther from home plate; those close plays would just be on different types of ground balls. So it is with the "objectively reasonable" standard. It changes the benchmark from whether the worker in fact posed a direct threat to himself and others to whether the company had a reasonable basis for thinking that. But articulating a belief that a worker posed such a risk is not an automatic get-out-of-trial card. There will still be close calls on whether the employer's belief was reasonable. The majority opinion well details why this is such a case. And close calls in the law require that a jury rather than a judge be the umpire.

I write separately to point out that this question—whether the railroad had good reason to believe Nall posed a safety risk—should be the only issue in this case. There is no doubt the railroad fired Nall because of those alleged safety concerns and that those concerns resulted from Nall's Parkinson's. So that disability is the reason Nall was fired. *See Cannon v. Jacob Field Servs. N. America, Inc.*, 813 F.3d 586, 594 (5th Cir. 2016) (finding causation "easily resolve[d]" when a company revoked a job offer because of concerns that the applicant's shoulder injury would prevent him from climbing a ladder).

We might be uncomfortable with so readily calling the railroad's action "discrimination." Today that word is usually equated with something

---

[1] This seems like something Yogi Berra would have said. It turns out the comment came from John Lowenstein, the left-handed hitting side of an outfield platoon for the 1983 World Champion Orioles. *See The 11 Best Baseball Quotes of All Time*, Bleacher Report (Aug. 30, 2010), https://bleacherreport.com/articles/446520-the-10-best-baseball-qoutes-of-all-time.

invidious.[2]  That is for understandable, indeed laudable, reasons given our history of pernicious, pervasive, and persistent prejudice against members of certain groups.  But the reality is that employers lawfully discriminate all the time in making hiring and promotion decisions.  Employers discriminate based on employees' education, work experience, intelligence, and work ethic to name a few common examples.  So the question often is not whether discrimination is occurring, but whether it is the type of discrimination that society, through its laws, has condemned.

The Americans with Disabilities Act was a long overdue recognition that discrimination against the disabled belongs in the unlawful category.  That discrimination is unjust to the disabled and deprives the economy of individuals who usually can fully and effectively perform their jobs.  But Congress decided that not all disability discrimination should be unlawful.  Because some disabilities may prevent some people from performing some jobs safely, the ADA provides a defense if the disabled employee will pose a safety threat to himself or others.  42 U.S.C. § 12112(b)(6), 12113(b); *see also* 42 U.S.C. § 12111(8) (defining a "qualified individual" under the ADA as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position").  This "direct threat" defense draws a

---

[2] That instinct led an employer to recently argue in the Sixth Circuit that an ADA plaintiff had to show animus.  *E.E.O.C. v. Dolgencorp, LLC*, 899 F.3d 428, 436 (6th Cir. 2018).  In rejecting that challenge to a verdict, Judge Sutton explained that:

the Act speaks in terms of causation, not animus.  An employer violates the Act whenever it discharges an employee 'on the basis of disability' (a necessary requirement for liability), not only when it harbors ill will (a sufficient way of establishing liability).  Imagine a company that fired a visually impaired employee to save itself the minimal expense of buying special software for her.  Without more, that would constitute termination 'on the basis of disability,' even if all of the evidence showed that cost-savings, not animus towards the blind, motivated the company.

*Id.* at 436 (internal citations omitted).

line not between discrimination and its absence, but between unlawful and lawful discrimination.

For cases like this one that turn on whether the disability renders the employee a safety risk (or the sometimes related statutory question whether the employee is unable to perform the essential functions of the job), there thus should not be a dispute about discriminatory intent. An employer cannot have it both ways by arguing that the termination was justified because the disability was dangerous while also maintaining that the safety-threatening disability was not the reason for the firing. When a concern about the disability's negative impact on workplace safety is the reason for the adverse action, the "causation" element of an ADA discrimination claim should be straightforward. *See Cannon*, 813 F.3d at 594; *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 762 (5th Cir. 1996); *E.E.O.C. v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018); *McMillan v. City of New York*, 711 F.3d 120, 129 (2d Cir. 2013).

Yet courts and employment lawyers are conditioned to thinking of causation as the difficult element to prove in discrimination cases; it often is the contested one in Title VII disparate treatment cases alleging race or sex discrimination. And when causation is disputed, courts and lawyers reflexively apply the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*McDonnell Douglas* is the "kudzu" of employment law. *Cf. Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring) (describing the "kudzu-like creep" of qualified immunity law). More than 57,000 court opinions have cited it. That's more than 3 cases a day (including weekends and holidays!) since the opinion was issued 45 years ago. Although courts keep trying to trim back its invasion of those parts of employment law where it does

not belong—pleading standards,[3] jury instructions,[4] or appellate review of jury verdicts,[5] for example—its dominance continues.[6]   As the judge-created doctrine has been widely criticized for its inefficiency and unfairness even in the space it is supposed to occupy[7]—a tool for evaluating the sufficiency of circumstantial evidence—we should not expand it beyond those bounds.[8]

I fear that is what is happening with the use of *McDonnell Douglas* to prove discrimination in Nall's case. To be sure, Nall also tried to prove discrimination with direct evidence.  But in doing so, he relied on the comments

---

[3] *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002) (reversing a district court's requirement that plaintiffs plead facts sufficient to raise an inference of discrimination under *McDonnell Douglas*).

[4] *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir. 1992) (explaining that a jury should not be instructed using the *McDonnell Douglas* standard).

[5] *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 993 (5th Cir. 2008) (noting that in an appeal from a jury verdict, the appellate court's focus is on whether the record supports the jury's finding of discrimination, "not on the plaintiff's *prima facie* case or the *McDonnell Douglas* framework").

[6] *See generally* Sandra F. Sperino, MCDONNELL DOUGLAS: THE MOST IMPORTANT CASE IN EMPLOYMENT DISCRIMINATION LAW (2018).

[7] *See Coleman v. Donahoe*, 667 F.3d 835, 862–63 (7th Cir. 2012) (Wood, J., concurring); *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008) (Kavanaugh, J.); D. Brock Hornby, *Over Ruled*, 21 GREEN BAG 2d 17, 22–26 (2017) (collecting extensive judicial and academic criticism of *McDonnell Douglas*); Sperino, *supra* note 6, at 317–27.

[8] *McDonnell Douglas* created the three-part framework to evaluate the evidence for a bench trial, *see* Hornby, 21 GREEN BAG 2d. at 22–23 (citing 411 U.S. at 802), as the original Title VII did not grant a jury right (the 1991 Civil Rights Act added one, *see* 42 U.S.C. § 1981a(c)).  *See generally Beesley v. Hartford Fire Ins. Co.*, 717 F. Supp. 781, 782 (N.D. Ala. 1989) (explaining that after Title VII's passage, judges in the South denied jury requests for fear that juries would ignore the Civil Rights Act's mandate); Vincenza G. Aversano, et al., *Jury Trial Right Under Title VII: The Need for Judicial Reinterpretation*, 6 CARDOZO L. REV. 613, 632–37 (1985) (suggesting that the drafters of Title VII omitted a jury right for fear that juries in the South would not give black plaintiffs a fair hearing).  The Supreme Court has since endorsed its use in evaluating circumstantial evidence at the summary judgment stage to decide whether a case gets to the jury.  *See, e.g.*, *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1355 (2015).  At the same time, it has repeatedly admonished that the test was "'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz*, 534 U.S. at 512 (2002) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, (1993) (quoting same); *U.S. Postal Serv. Bd. Of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting same).

of certain supervisors, which itself requires recourse to another complicated multipart test. *See Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655 (5th Cir. 1996).

There is a simpler and more convincing direct evidence route. To use a modern phrase, the firing "is what it is": the railroad has all along acknowledged that it fired Nall because of concerns about his Parkinson's. That's discrimination on the basis of a disability. *See Rizzo*, 84 F.3d at 762 (explaining that the court did not need to "engage in the *McDonnell Douglas* presumptions in order to infer discrimination" because the employer did "not deny that [the employee] was removed from driving duties because of her hearing impairment"); *cf. Dolgencorp, LLC*, 899 F.3d at 435 (explaining that an employer's neutral justification does not come into play when there is direct evidence of disability discrimination). So, like many ADA cases, the hard issue in this one is not whether there was discrimination but whether that discrimination was justified.

This case should be an example of why *McDonnell Douglas* is not the be-all and end-all of proving discrimination. There are other ways, including that the discrimination is obvious.

JAMES C. HO, Circuit Judge, dissenting:

Under the Americans with Disabilities Act, an employer cannot be held liable where the plaintiff presents "a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(a)–(b). I agree with the majority that "[w]hether an employer has properly determined that a person poses a direct threat depends on 'the *objective reasonableness* of [the employer's] actions.'" Maj. Op. at 9 (emphasis added) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998)). But I part company with the majority's interpretation and application of the "objective reasonableness" standard.

Just because an employee disagrees with an employment decision—and just because a plaintiff's expert disagrees with the underlying medical judgment that led to that employment decision—does not make the employment decision "objectively unreasonable." To warrant trial, a plaintiff must present evidence that *no reasonable person* could agree with the employer's determination—evidence that it was *objectively unreasonable* to conclude that the plaintiff presented a direct threat to the health or safety of others. Michael Nall presented no such evidence here. All he says, in essence, is that he and his experts disagree with his employer and its experts. Accordingly, the district court was correct to render summary judgment for BNSF.

Under the majority's approach, however, a plaintiff is entitled to take a case to trial so long as he can identify some procedural irregularity in the process used by his employer to determine whether or not he presents a direct threat. I disagree. There is no basis for imposing liability under the ADA based on process concerns alone. There is liability only if the employer's determination of a direct threat is objectively unreasonable. And the majority

has not identified any process irregularity that renders BNSF's medical conclusion objectively unreasonable.  I respectfully dissent.

## I.

The development of the "objectively reasonable" standard and its application in employment discrimination cases helps inform the way that we should apply the standard—and where the majority's analysis falters.

Generally, the "direct threat" defense balances the ADA's abhorrence of irrational bigotry toward the disabled with the reasonable safety concerns of industry and the need to give employers room to operate their businesses in good faith.  *See Bragdon*, 524 U.S. at 649 ("The ADA's direct threat provision stems from the recognition . . . of the importance of prohibiting discrimination against individuals with disabilities while protecting others from significant health and safety risks.").

To maintain this balance, the Supreme Court first articulated the "objectively reasonable" standard under the public accommodations provisions of the ADA.  *See Bragdon*, 524 U.S. at 649–50.  The Court held that the "existence, or nonexistence, of a [direct threat] must be determined from the standpoint of the person [allegedly violating the ADA], and the risk assessment must be based on medical or other objective evidence."  *Id.* at 649.  The Court emphasized that courts should be concerned only about the "objective reasonableness" of the evidence.  *Id.* at 650.

The textual similarities between the public accommodations provisions and the employment provisions have led some of our sister courts to adopt the *Bragdon* standard for employment claims.  *See, e.g.*, *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 307 (6th Cir. 2015); *Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) ("We recognize that *Bragdon* was not an employment case. . . .  But the Court explicitly pointed out that the ADA contains parallel

language in its employment provisions and we see no reason not to apply *Bragdon*'s analysis to employment cases.") (internal citations omitted).[1]

In a faithful application of the "objectively reasonable" standard, the question for juries is not whether an employer was "right" to find a direct threat to safety, but whether it was reasonable to do so. *See, e.g., Jarvis*, 500 F.3d at 1122 ("In evaluating an employer's direct-threat contention, the fact-finder does not independently assess whether it believes that the employee posed a direct threat."). The distinction between what is "right" and what is simply "reasonable" is critical, because the ADA does not forbid reasonable reliance on allegedly incorrect experts, but rather, irrational discrimination against the disabled. As a result, "[a] medical opinion may conflict with other medical opinions and yet be objectively reasonable." *Michael*, 808 F.3d at 307 (citing *Bragdon*, 524 U.S. at 650).

So it is not enough that experts disagree over whether or not Nall presents a direct threat to the health or safety of others. Rather, there must be evidence that it was *objectively unreasonable* for BNSF to reach that conclusion.

## II.

BNSF reasonably relied on the evidence available to conclude that Nall was a "direct threat." The record in this case shows that BNSF employees had sincere (and serious) concerns about Nall's ability to do his job—concerns that

---

[1] *Compare* 42 U.S.C. § 12113(b) (providing an employer may have "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace") *and* 42 U.S.C. § 12111(3) ("The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.") (employment), *with* 42 U.S.C. § 12182(b)(3) ("Nothing in this subchapter shall [apply] where [an] individual poses a direct threat to the health or safety of others. The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services.") (public accommodations).

were far from dispelled by Nall's independent evaluations. Moreover, BNSF's field test confirmed its employees' concerns, and demonstrated that Nall could not do his job safely. Nall responds, in essence, that he and his doctors disagree.

Nall and BNSF agree about his core job responsibilities: operating switches, coupling air hoses, making quick hand and leg movements, performing training and equipment inspections, climbing on and off equipment, and maintaining good balance and a steady gait. Nall agrees that conductor and switchman are physically demanding positions for which safety is paramount. Furthermore, Nall admits that, on top of the express, written requirements of his job, it is important for him to be able to react quickly and to maintain his balance.

Nall's co-workers were the first to notice that something was wrong. They told BNSF that Nall was taking a long time to repeat information back to the dispatcher, and that he was also having difficulty walking along the track. BNSF memorialized these concerns in its original "Notice of Leave": employees "observed [Nall] having difficulty getting on and off engines as a result of stumbling as well as displaying a lack of concentration when receiving mandatory directives from dispatchers." Nall's response is essentially that he disagrees with his co-workers' characterizations.

After initially being placed on leave, Nall consulted four different doctors. They all reached the bottom line conclusion that Nall could perform his job. But three of them also confirmed the very concerns that gave BNSF pause. First, Dr. Nishith Majmundar observed that Nall had cogwheeling rigidity (or stiffness) and problems with balance (for which Nall blamed his shoes), and accordingly recommended that Nall increase the dosage of his medication. Second, Clinical Neuropsychologist Stephen Lippold noted some

short-term verbal memory problems.  Third, Licensed Occupational Therapist Mary Karasek noted that Nall had some problems walking on an uneven surface, a "mild, shuffling" gait, difficulty walking on a treadmill, and a delayed reaction time.  Her conclusion was that Nall was able to do what his job required, but that his balance could be a concern.  Only Doctor Joseph Jankovic was able to give Nall an unequivocal statement of support.  He concluded that Nall was able to do his job, and that his "balance and gait has never been an issue."

Not surprisingly, then, these evaluations did not assuage BNSF.  Despite their positive bottom-line conclusions, they also suggested that the concerns of Nall's co-workers might be valid.  So BNSF asked Nall to take part in a field test that required him to perform various tasks under supervision.  Though he successfully completed the tasks, one employee described Nall's field test as "[p]robably one of the most blatant 'there is no way this guy is safe' field tests" she had ever seen.  Findings from the field test highlight that Nall was confused while interpreting car numbers and the "switch list"; he had difficulty holding on to the equipment towards the end of the ride; he walked between moving equipment; he gave the wrong signal to the engineer; and he exhibited other minor physical problems that concerned observers.  After the field test, BNSF told Nall he was still not safe to return to work.

Nall agrees that the field test required him to do things he would normally have to do for his job, but he disagrees with the conclusions of the field test.  He disputes that he broke any rules.  He also disputes some of the characterizations of his abilities.  For example, he claims he did not have trouble with his balance.  According to Nall, any concerns about his balance are just "what [the physical therapist] feels like, but [Nall] didn't have a problem with his balance."  Nall "personally think[s he] did great on the test."

But he does not claim that the therapist who wrote the evaluation had any reason to make up the observations. The closest he comes to disputing the legitimacy of the field test is saying that BNSF was "looking for something wrong" with his performance, and that it was focusing on the bad rather than the good.

## III.

At most, the evidence cited in Nall's favor shows that his experts disagree with BNSF's experts on their bottom-line conclusions. But it was entirely reasonable for BNSF to give more weight to its own evaluation. After all, the things that BNSF evaluated in the railyard field test are not the kinds of things that doctors could test in their offices.

The evidence marshaled by Nall and the majority does not reach the core question of whether or not BNSF was objectively reasonable in finding a direct threat to health or safety. At most, it establishes merely a good faith dispute between experts after an orderly process: Long after BNSF first learned about Nall's original diagnosis, his co-workers brought safety concerns to the company's attention. Nall was then evaluated by independent doctors who confirmed some of those very same concerns. BNSF then conducted a field test to observe whether those concerns would manifest themselves in his job performance. And because they did, BNSF reasonably concluded that he was unsafe to return to work.

The majority addresses the record evidence at too high a level of generality. For example, the majority says that the reports from Nall's doctors "concluded that Nall could safely perform the tasks of a trainman listed on the medical status form that BNSF originally provided to Nall." Maj. Op. at 12. As noted, however, three out of Nall's four doctors confirm concerns about his balance and physical ability.

31

Under the objective reasonableness standard, we do not simply divide the evidence into "generally positive" and "generally negative" categories, announce the existence of a fact dispute, and then proceed to trial. Rather, we must separately determine whether any evidence exists that the employer was objectively unreasonable in relying on the negative evidence. Otherwise, all it would take is disagreement by a single doctor to foreclose summary judgment—even if the employer reasonably relied on expert medical opinion.

The evidence cited by Nall and the majority creates no issue of fact concerning whether BNSF behaved reasonably and relied on reasonable medical opinion. First, the majority cites medical reports from Nall's experts concluding that Nall could do his job safely. But these reports do not question the integrity of BNSF's evaluation. To the contrary, they confirm some of BNSF's concerns about Nall's physical and mental ability. Second, the majority asserts that Nall completed all of the tasks in his first field test. While true as far as it goes, it was the *manner* in which Nall completed the tasks that led to BNSF's decision. Third, the majority contends that we have previously found a disputed field test sufficient to preclude summary judgment. But in *EEOC v. E.I. Du Pont de Nemours & Co.*, we held only that an employee who fails a field test at first, but then later demonstrates that she is capable of performing her job duties, is entitled to present that dispute to the jury. *See* 480 F.3d 724, 728 (5th Cir. 2007) ("After the [1999 field test] confirmed [the employee's] walking impairment, [the employer's] physicians concluded that she should be medically restricted from walking anywhere at the plant. . . . [The employee's] attempt to get her job back was rebuffed by [the employer], even though she demonstrated in 2003 that she could walk an evacuation route without assistance."). That is not this case. To the contrary, the evidence here if anything indicates that Nall's condition has worsened, not improved.

Finally, the majority notes that Nall disputes some of BNSF's evaluation and his co-workers' evaluations. But mere disagreement does not create an issue of fact—because it does not establish the *unreasonableness* of BNSF's reliance on those evaluations.

None of this evidence purports to show that BNSF relied on an objectively unreasonable opinion. At most, the evidence would simply allow the jury to reach a different conclusion about the competing experts. *Cf. Michael*, 808 F.3d at 307 ("An employer's determination that a person cannot safely perform his job functions is objectively reasonable when the employer relies upon a medical opinion that is itself objectively reasonable.") (internal citation omitted). To proceed to trial under these circumstances would replace the objective reasonableness standard with a *de novo* review of the employer's experts.

## IV.

According to the majority, "the question on appeal is not whether it was reasonable for BNSF to *conclude* that Parkinson's disease symptoms prevented Nall from safely performing his duties; the question is whether BNSF came to that conclusion via a reasonable *process* that was not, as Nall alleges, manipulated midstream to achieve BNSF's desired result of disqualifying him." Maj. Op. at 11. I disagree with the majority's process concerns for two reasons.

To begin with, I see no basis for a process-based liability theory under the ADA. To my mind, Nall can prevail only if BNSF lacks a reasonable medical basis for concluding that he presents a direct threat to health or safety—and not based on process concerns alone. After all, an employee is a direct threat if he poses a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).

And as the majority acknowledges, we ask only whether it was reasonable for the employer to conclude that its employee was a direct threat—not whether it was correct.

So an employer cannot be held liable if it reaches a reasonable medical judgment that an employee presents a direct threat to the health or safety of others. The ADA does not impose liability based on perceived procedural irregularities alone. To quote the Sixth Circuit: "An employer's determination that a person cannot safely perform his job functions is objectively reasonable *when the employer relies upon a medical opinion that is itself objectively reasonable.*" *Michael*, 808 F.3d at 307 (emphasis added) (collecting cases). *See also, e.g., Bragdon*, 524 U.S. at 650 ("[C]ourts should assess the objective reasonableness of the views of health care professionals."). An employer can only be held liable based on process concerns if the procedural irregularities render the employer's medical conclusion unreasonable.

Second, the majority has not identified any process concerns that should call into question the reasonableness of BNSF's medical conclusions. The majority primarily faults BNSF for what it characterizes as shifting job requirements and disqualification criteria—specifically, the addition of quick reaction times and good balance as essential job criteria. But Nall himself conceded that his job required him to have quick reaction times and good balance:

> Q. Do you agree it's important when you're performing the conductor job or the switchman job or another trainman job, it's important to be able to react quickly if necessary?
> [Nall]. Yes, sir.
> Q. Okay. And do you agree it's important to be able to maintain balance and not slip or fall when you're working those positions?
> A. Yes, sir.

34

No. 17-20113

And it was precisely Nall's reflexes and his lack of balance that concerned BNSF.  In contrast, in *Riel v. Electronic Data Systems Corp.*, the parties actually disagreed about essential job functions, thereby creating an issue of material fact for a jury to resolve.  *See* 99 F.3d 678, 682–83 (5th Cir. 1996).

Moreover, as previously noted, among Nall's own four doctors, three of them expressed concern with his abilities.  And the field test further confirmed all of BNSF's fears.  In sum, the process employed by BNSF yielded reasonable medical judgments on which BNSF reasonably relied.

\* \* \*

Although the majority opinion appears to state the applicable legal standard correctly, it is the majority's application of that standard—and not just its mere recitation—that will form circuit precedent.  The majority has set this circuit on a road that is contrary to both the vision established by Congress and the very rule that it purports to adopt.  I respectfully dissent.