KETHLEDGE, J., delivered the opinion of the court in which COOK, J., joined. GILMAN, J. (pp. 309-18), delivered a separate dissenting opinion.
OPINION
KETHLEDGE, Circuit Judge.
The City of Troy (Michigan) Police Department placed Todd. Michael, a patrol officer, on unpaid leave in 2010. The City did so for two reasons: first, Michael had engaged in a two-year pattern of aberrant behavior from 2007-09; and second, after Michael underwent brain surgery in 2009, two doctors concluded in detailed reports that Michael could not safely perform the functions of a patrol officer. Michael thereafter sued the City under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. The district court granted summary judgment to the City. We affirm.
Michael began working for the City as a patrol officer in 1987. In 2000 he was *306 diagnosed as having a non-cancerous brain tumor. Surgeries to remove the tumor in 2000 and 2001 were only partially successful; each time the surgeons could not remove certain parts of the tumor, which then continued to grow. The City granted Michael paid medical leave for each surgery, and returned him to the force once his surgeons cleared him for work.
Beginning in 2007, however, the City became aware of aberrant behavior on Michael’s part. Among other things, Michael’s then — wife Jamie found a box of empty steroid vials — some of which were labeled for veterinary use and all of which belonged to Michael — which she turned over to the City’s then-Chief of Police, Charlie Craft. Michael then demanded the vials back from Craft. When Craft refused, Michael embarked on a two-year campaign to get them back, which included secretly recording Craft, suing Craft in small-claims court, and attempting to serve Craft with process at a party celebrating Craft’s retirement from the Department. In addition, Michael secretly recorded Jamie during their marriage-counseling sessions (they later divorced) and during family gatherings, and then — on the basis of those recordings — asked the City prosecutor to charge Jamie with perjury. Meanwhile, the City’s new Chief of Police, Gary Mayer, received reports that Michael had accompanied a cocaine dealer to several drug deals. Mayer suspended Michael from active duty pending an investigation.
The City tabled that investigation shortly thereafter, when Michael notified them (in early 2009) that he needed brain surgery for a third time. That surgery took place as scheduled and Michael’s surgeon cleared him for work in July 2009. But the City had its doubts about his fitness— largely based on Michael’s aberrant behavior — so they informed Michael that he needed to pass a psychological evaluation before he returned to work.
To that end, the City referred Michael to a neuropsychologist, Dr. Firoza Van Horn. She interviewed and tested Michael for seven hours in her office, and then drafted a detailed report in which she ultimately concluded that Michael “may be a threat to himself and others.” Based on Van Horn’s report, the City placed Michael on unpaid leave. Michael then sought a second opinion from Dr. Philip Leithen, another neuropsychologist, who interviewed Michael and pronounced him fit for duty. The City then sent Michael to • another neuropsychologist, Dr. Bradley Sewick, who examined Michael in his office and wrote a detailed report that reached the same conclusion that Dr. Van Horn had reached. Two other doctors who reviewed Michael’s file (but did not examine him) at the request of Michael’s disability-insurance company, on the other hand, concluded that he could return to work. Finally, again on his own initiative, Michael saw Dr. Linas Bieliauskas, a professor of neuropsychology at the University of Michigan. After interviewing Michael and performing tests, Dr. Bieliauskas concluded that Michael has weak “executive functioning,” that “I cannot recommend that the patient return to full patrol duties[,]” and that “[sjafety with use of weapons and high-speed driving would be in question.”
Michael gave his superiors the reports of Dr. Leithen and the insurance-company doctors, but kept Dr. Bieliauskas’s report to himself. The City decided to keep Michael on unpaid leave, mostly because of the conclusions of Drs. Van Horn and Sew-ick, but also because Michael’s own behavior tended to confirm those conclusions.
Michael thereafter brought suit under the ADA, claiming that the City had regarded Michael as disabled and discrimi *307 nated against him on that basis. The district court granted summary judgment to the City, holding as a matter of law that Michael was not qualified for the position of patrol officer. We review that decision de novo. Keith v. Cnty. of Oakland, 703 F.3d 918, 923 (6th Cir.2013).
Michael brings his claims specifically under section 12112(a) of the ADA, which provides that “[n]o covered entity shall discriminate against a qualified individual on the basis of disability])]” 42 U.S.C. § 12112(a). Thus, to prevail on a claim under this section, a plaintiff must prove that (1) he is disabled as defined by the Act, (2) he is a “qualified individual]],]” and (3) his employer “discriminate^” against him “on the basis of disability.” Id.
We focus on the second element here. The Act defines “qualified individual” as “an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.” 42 U.S.C. § 12111(8). A disabled person is not qualified for an employment position, however, “if he or she poses a ‘direct threat’ to the health or safety of others which cannot be eliminated by a reasonable accommodation.” Mauro v. Borgess Med. Ctr., 137 F.3d 398, 402 (6th Cir.1998); see also Holiday v. City of Chattanooga, 206 F.3d 637, 647 n. 4 (6th Cir.2000) (same); 42 U.S.C. § 12113(b). A “direct threat” is “a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.” Id. § 12111(3).
Whether an employer properly determined that a person poses a direct threat, for purposes of the ADA, depends on “the objective reasonableness of [the employer’s] actions.” Bragdon v. Abbott, 524 U.S. 624, 650, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). An employer’s determination that a person cannot safely perform his job functions is objectively reasonable when the employer relies upon a medical opinion that is itself objectively reasonable. See, e.g., Holiday, 206 F.3d at 645-46; Darnell v. Thermafiber, Inc., 417 F.3d 657, 660 (7th Cir.2005). A medical opinion may conflict with other medical opinions and yet be objectively reasonable. Bragdon, 524 U.S. at 650, 118 S.Ct. 2196 (“A health care professional who disagrees with the prevailing medical consensus may refute it by citing a credible scientific basis” for doing so).
An employer need not rely on a medical opinion, however, to determine that a person poses a direct threat. Rather, “testimonial evidence” concerning the employee’s behavior “can provide sufficient support for a direct threat finding under the ADA.” Darnell, 417 F.3d at 660. For example, in EEOC v. Amego, Inc., 110 F.3d 135 (1st Cir.1997), the plaintiffs job responsibilities included administering medication in a resident facility for persons with severe behavioral disorders. The First Circuit agreed with the plaintiffs employer that she had “show[n] by her conduct — by behavior leading co-workers to have concerns about whether she was a risk to clients and by her two attempts to commit suicide using prescription and non-prescription drugs — that she could not reasonably be trusted to meet her responsibilities as to medications.” Id. at 141. Thus, on the basis of behavioral evidence alone, the First Circuit held as a matter of law that the employer’s determination (that the plaintiff posed a direct threat) was objectively reasonable. Id. at 145.
Both types of evidence support the City’s determination here. First, the City relied on the opinions of Drs. Van Horn and Sewick that Michael could not safely *308 perform the functions of a City patrol officer. Dr. Van Horn examined Michael for more than seven hours in her office and spent another nine hours reviewing her test data and preparing her report, which runs more than 11 pages single-spaced. She also reviewed the City’s job description for the position of patrol officer. She found that “[t]he specific deficits that Officer Michael demonstrates are difficulty switching mental set and handling more than one task at a time, visual memory, tactile perception, problem solving and new learning ability.” She concluded that, “[fjrom a neuropsychological viewpoint, there is convincing evidence that Officer Michael is not competent to handle his duties as a police officer. Given his cognitive deficits, he may be a threat to himself and others. The fact that he tends to underreport his difficulty is a concern.”
Dr. Sewick examined Michael for 90 minutes in his office, reviewed Dr. Van Horn’s report and her entire file, including her test' results, and prepared a seven-page single-spaced report, in which he discussed the job functions of a City patrol officer. Dr. Sewick then sent City Captain Gerard Scherlinck a letter in which Dr. Sewick concluded as follows:
[I]t is my opinion that because of his medical condition, Officer Michael presents with a combination of problems that I think may likely negatively impact his abilities to effectively perform the job functions of a police officer in some areas and under certain conditions. In particular, it is my opinion that the problems that I see in areas of unstructured constructional capacities, motor problem solving, marginal cognitive set shifting capacities and compromised upper extremity sensory-motor functions can likely adversely impact job functions, particularly in areas of high speed defensive driving, split-second decision making, and the hand-to-hand application of force up to and including deadly force.... Again, because of the presence of the problems outlined above, I do unfortunately think that in the full capacities of a police officer, with these problems Officer Michael would pose a safety risk to himself and others under certain conditions.
These medical opinions are a galaxy apart from the ones we deemed inadequate in Keith — where the County’s doctor dismissed out of hand Keith’s ability to be a lifeguard because “[hje’s deaf[,]” 70S F.3d at 924 — and in Holiday, where the doctor’s opinion was only “two scribbled lines at the bottom of a boilerplate evaluation form.” 206 F.3d at 646. Instead, both of the opinions here are objectively reasonable; and thus so was the City’s reliance on them.
Michael responds that the opinions of Dr. Leithen and the insurance-company doctors (whom we collectively call “Michael’s medical witnesses”) show that the opinions of Drs. Van Horn and Sewick are wrong. Each of Michael’s medical witnesses quarreled with Dr. Van Horn’s interpretation of her test results and with her conclusions. And in many ways the reports of Michael’s medical witnesses are just as detailed as the reports of Drs. Van Horn and Sewick, though neither of the insurance-company doctors examined Michael in person. That said, we doubt that the reports of Michael’s medical witnesses each reflect an “individualized inquiry” as that term is used in the caselaw. That kind of inquiry requires an evaluation not only of the plaintiffs medical condition, but — more to the point — of “the effect, if any, the condition may have on his ability to perform the job in question.” Keith, 703 F.3d at 923 (emphasis added). And on that point Michael’s medical witnesses had relatively little to say. Only one of the *309 doctors discussed the specific job functions of the City’s patrol officers, and none ventured specifically to say that Michael could safely engage in high-speed driving or make snap decisions regarding whether to. use lethal force. Those omissions are conspicuous.
But there is a larger problem with Michael’s argument. Reasonable doctors of course can disagree — as they disagree here — as to whether a particular employee can safely perform the functions of his job. That is why the law requires only that the employer rely on an “objectively reasonable” opinion, rather than an opinion .that is correct. See Jarvis v. Potter, 500 F.3d 1113, 1122 (10th Cir.2007) (“[T]he fact-finder’s role is to determine whether the employer’s decision was objectively reasonable.”). Indeed, in many cases, the question whether one doctor is right that an employee can safely perform his job functions, or another doctor is right that the employee cannot, will be unknowable— unless the employer runs the very risk that the law seeks to prevent. Here, the City was not required to invite a section 1983 claim later in order to avoid an ADA claim now. Right or wrong, the opinions upon which the City relied were objectively reasonable; and that means the City is not liable.
Moreover, the City did not act on the opinions of Drs. Van Horn and Sewick alone. The second basis of the City’s decision, rather, was Michael’s own conduct, which Dr. Leithen and the insurance-company doctors did not discuss, and which obviously raised grave concerns regarding Michael’s judgment. In a two-year span prior to Michael’s third brain surgery, Michael tape-recorded his marriage-counseling sessions with his ex-wife, Jamie, and then asked a prosecutor to charge her with perjury. He possessed a box of empty steroid vials, some of whose labels were in foreign languages, and others of whose labels said “for veterinary use only.” After Jamie gave those vials to Chief Craft,. Michael recorded his conversations with Craft and then used those recordings to try to persuade Captain Scherlinck to return the vials. When that failed, Michael sued Craft for the vials’ return and arranged for Craft to be served with process at his retirement party. The City, as noted above, also heard that Michael had accompanied a drug dealer to several drug deals; Thus, on the record here, “[i]t was eminently reasonable” for the City “to be concerned about whether [Michael] could meet [his] responsibilities, and also reasonable for it to conclude that the risk was too great to run.” Amego, 110 F.3d at 145.
In conclusion, like the district court, we respect Michael’s desire to continue making a contribution to his community as a patrol officer. On this record, however, the City’s decision not to return him to duty was objectively reasonable.
The district court’s judgment is affirmed.