RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0041p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LARRY S. SMITH,

      *Plaintiff-Appellant,*

      *v.*

NEWPORT UTILITIES,

      *Defendant-Appellee.*

> No. 24-5502

───────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Greeneville.
No. 2:22-cv-00112—Clifton Leland Corker, District Judge.

Decided and Filed: February 27, 2025

Before: SUTTON, Chief Judge; KETHLEDGE and MURPHY, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ON BRIEF:** Jeffrey C. Taylor, TAYLOR LAW FIRM, Morristown, Tennessee, Ben W. Hooper, III, CAMPBELL & HOOPER, Newport, Tennessee, for Appellant. Mark E. Stamelos, Paige M. Lyle, FORDHARRISON LLP, Nashville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

MURPHY, Circuit Judge. For many decades, Larry Smith provided valuable service to his employer, Newport Utilities, by repairing downed powerlines during weather emergencies. Eventually, however, Smith began to suffer from seizures. When he had two on-the-job incidents within months of each other, Newport Utilities put him on leave and later forced him to retire. Smith sued Newport Utilities under the Americans with Disabilities Act (ADA), alleging that it had discriminated against him based on his disability. But the district court held that

Smith posed a safety threat in his position and that Newport Utilities could not reasonably accommodate him. We agree and so affirm the court's grant of summary judgment to the company.

I

Newport Utilities provides electrical, wastewater, water, and broadband services to residents in and around Newport, Tennessee. Its electrical division relies on many employees—ranging from meter-service technicians to equipment operators to linemen—to keep electricity flowing to its customers.

Smith accepted a job in the stock room for this electrical division in 1988. His supervisors consistently viewed him as an excellent employee, and he gradually worked his way up the ranks. In 2014, Smith received a promotion to one of the division's three "bucket foreman" positions—the last position he held until his retirement.

At the time that Newport Utilities employed Smith, it primarily relied on two teams (each consisting of a bucket foreman and a lineman) to maintain and fix electrical facilities in the field. These "dangerous" jobs required the teams to work with live (potentially deadly) powerlines often in extreme weather conditions. Smith Dep., R.17-1, PageID 114–16. The teams also had to "[c]limb" up poles and operate a "bucket truck" to reach elevated lines. Job Description, R.17-1, PageID 138. The bucket foreman supervised the other lineman and had to stay alert at all times.

The teams used a bucket truck to travel to powerlines in need of repair. Although a single driver could operate the truck, Newport Utilities required both employees to possess a commercial driver's license. If one employee got injured while repairing a line in a remote area (for example, "up on Bull Mountain"), the other might have to drive the truck "out to civilization" to seek medical aid. Frisbee Dep., R.25-4, PageID 519.

The teams also regularly worked unusual hours. A bucket foreman's standard two-week schedule consisted of 36 hours over four days in one week and 44 hours over five days the next week. But linemen had to serve one week of "standby" every seven weeks for after-hours

emergencies. And the teams might have to report for overtime with 30 minutes' notice whenever bad weather or other events led to power outages. These unexpected outages routinely required long hours. Smith estimated that he worked for over 24 hours straight "400 or 500" times during his career. Smith Dep., R.17-1, PageID 108–09.

This exhausting work may have taken its toll on Smith. When combined with the stress of losing his parents, he began to suffer from what he called "stare seizures" in 2009 or 2010. *Id.*, PageID 124. The seizures could last as short as a few seconds or as long as 60 to 90 seconds. During a seizure, Smith would be "mentally altered" and not know what was happening around him. Undisputed Facts, R.22, PageID 715. He lacked warning signs about when a seizure might take place, and the seizures seemed to happen at unpredictable times.

Smith's seizures came to the attention of Newport Utilities in March 2020. An "exhausted" Smith had been working "all night" repairing lines with another employee. Smith Dep., R.17-1, PageID 122. While driving the truck, Smith suffered a seizure and "swerved a little bit" out of his lane. *Id.*, PageID 123. The other employee in the truck noticed the seizure and reported the incident to their supervisor. The supervisor told Smith to see a doctor. Smith's personal physician cleared him to return to work.

That August, though, Smith had another incident in the field. At the time, he had already put in dozens of overtime hours during his "standby" week. The summer heat had also reached 95 degrees. When repairing an elevated powerline, one of Smith's coworkers went up in the bucket. Smith and other employees remained on the ground. From the elevated bucket, the coworker spotted Smith lying "facedown on the ground" and feared that he had died. Frisbee Dep., R.25-4, PageID 523. This coworker told the others to place a "mayday call." *Id.* An ambulance took Smith to the emergency room. The doctors diagnosed him with heat exhaustion. But they also released him to return to work the same day.

Nevertheless, Connie Frisbee, the Vice President of Human Resources for Newport Utilities, placed Smith on temporary leave under the Family Medical Leave Act. Given the two incidents within months of each other, Frisbee worried that Smith's seizures could cause a "catastrophic event" and get someone killed. *Id.*, PageID 524. Frisbee asked Dr. Marilyn

Bishop, a private physician who served as the company's medical review officer, to evaluate Smith. Smith's personal doctor also completed the paperwork that took him "out of work" for the short term. Undisputed Facts, R.25, PageID 485.

Over the next two months, Frisbee received reports from both Smith's personal doctor and Dr. Bishop. Smith's doctor noted that the "Neurology" department had diagnosed him with "absence seizures." Letter, R.17-1, PageID 142. This doctor also opined that Smith could return to the job by mid-October if he worked no more "than 12 hours a day or 55 hours in a one-week period." *Id.* The doctor requested this "work accommodation" out of concern that "sleep deprivation or physical exhaustion" contributed to Smith's seizures. *Id.* In her report, Dr. Bishop agreed with these hours restrictions and added another limit: that Smith could not operate any "company vehicles or powered equipment" for at least five months. Rep., R.17-1, PageID 144. She recommended that Smith take "[m]edical leave" during those months. *Id.*

After receiving Dr. Bishop's report, Frisbee suggested that Smith apply for long-term disability benefits because the company could not accommodate the identified work restrictions. Smith did so. In the application for these disability benefits, his neurologist diagnosed him as having "[c]omplex partial seizures w/ impairment of consciousness." Statement of Disability, R.17-1, PageID 150. The neurologist also listed similar work restrictions on this paperwork.

Dr. Bishop evaluated Smith again in April 2021. At this time, she removed the driving restriction. But she increased the hours restriction. Bishop suggested that Smith could perform his job if Newport Utilities eliminated any "standby work" and limited him to a 40-hour work week. Rep., R.17-1, PageID 156.

Ultimately, Frisbee decided that a bucket foreman's ability to work extended hours on short notice was essential to the job. So she investigated whether Newport Utilities could transfer him to a different role. Frisbee concluded that Smith did not qualify for any open positions. She thus chose not to speak with him about the possibility of transferring.

Instead, Frisbee sent Smith a letter informing him that Newport Utilities could not accommodate his seizure condition and that the company would fire him at the end of May 2021.

But she also gave him the option to retire and keep various benefits. Given this difficult choice, Smith chose to retire.

Since retiring, Smith has suffered about ten more seizures. He also does not believe that he should drive commercial vehicles for safety reasons.

Despite this belief, Smith sued Newport Utilities under, as relevant now, the ADA. The district court granted summary judgment to Newport Utilities. *See Smith v. Newport Utils.*, 2024 WL 1660580, at *8 (E.D. Tenn. Apr. 17, 2024). "We review that decision de novo." *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 307 (6th Cir. 2015).

II

The ADA makes it illegal for a covered employer to "discriminate against a qualified individual on the basis of disability[.]" 42 U.S.C. § 12112(a). Smith claims that Newport Utilities violated this ban because it required him to retire due to his medical condition. Newport Utilities responds that it did not permit Smith to continue working because his seizures might lead him to black out and kill someone. This appeal thus requires us to consider how the ADA accounts for a concern that disabled employees might injure themselves or others in a particular job.

A

Two parts of the ADA's discrimination ban might matter to this question. The ADA requires plaintiffs to establish both that their employer has "discriminate[d]" against them because of their disability and that they fall within the statutory definition of "qualified individual[.]" *Id.*; *see Michael*, 808 F.3d at 307. The risk that an employee might cause harm could factor into either of these elements. Indeed, a circuit conflict appears to have developed on the way that courts should evaluate that risk under the ADA. *See Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 12 n.14 (6th Cir. 2012) (citing cases); *Branham v. Snow*, 392 F.3d 896, 906 n.5 (7th Cir. 2004) (same).

Start with the meaning of "discriminate." The ADA defines the phrase "discriminate against a qualified individual on the basis of disability" to include several specific actions.

42 U.S.C. § 12112(b). Among other things, an employer discriminates in this prohibited way if it uses "qualification standards" that screen out disabled individuals unless the standards are "job-related for the position in question" and "consistent with business necessity[.]" *Id.* § 12112(b)(6). The ADA thus allows employers to rebut discrimination charges with the affirmative defense that a disabled person cannot satisfy a "qualification standard[]" that meets these "job-related" and "business necessity" elements. *Id.* § 12113(a); *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78 (2002). And a permissible "'qualification standard[]' may include a requirement that an individual shall not pose a *direct threat* to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b) (emphasis added). This affirmative-defense view of things might place the burden of proof on an *employer* to show that an ADA plaintiff qualified as a direct threat. *See Pontinen v. U.S. Steel Corp.*, 26 F.4th 401, 406 (7th Cir. 2022); *cf. Echazabal*, 536 U.S. at 78.

Turn to the meaning of "qualified individual." The ADA defines that phrase as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Our cases have repeatedly suggested that employees who represent a direct threat of harm to themselves or others cannot show that they are "qualified individuals" under this definition. *See Est. of Mauro ex rel. Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 402 (6th Cir. 1998); *see also Michael*, 808 F.3d at 307; *Holiday v. City of Chattanooga*, 206 F.3d 637, 647 n.4 (6th Cir. 2000). In essence, then, we have treated the need for employees not to cause harm as an "essential function" of all jobs. 42 U.S.C. § 12111(8). And if plaintiffs cannot show they are "qualified" for the relevant position under the ADA, they cannot prove their discrimination claim. *Id.* § 12112(a). This element-of-the-claim view of things might place the burden of proof on *plaintiffs* to show that they did not qualify as a direct threat. *See LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 836 (11th Cir. 1998).

The parties do not engage with this burden-of-proof question, so we opt not to resolve it. We will instead assume that Newport Utilities bore the burden to show that Smith qualified as a direct threat of harm if he remained in his role as a bucket foreman. As a result, we will also assume that the company could obtain summary judgment only if it "affirmatively introduce[d]"

such evidence that "no rational jury" could disagree with its conclusion that Smith represented a direct threat of harm. *Lemaster v. Lawrence County*, 65 F.4th 302, 310 (6th Cir. 2023).

B

These assumptions narrow this appeal down to three main issues. Smith claims that Newport Utilities did not satisfy its burden to show that he posed a direct threat of harm. Even if Smith did qualify as such a threat, he next claims that a dispute of fact exists over whether Newport Utilities could have reasonably accommodated him in a way that would have eliminated that threat. He lastly claims that Newport Utilities violated the ADA by failing to properly discuss potential accommodations with him. None of these claims has merit.

1. Direct Threat

The ADA defines "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). A regulation expands this definition to include a significant risk of harm to disabled individuals *themselves*. 29 C.F.R. § 1630.2(r); *Echazabal*, 536 U.S. at 78–87. The regulation tells employers to consider four factors when deciding whether a significant risk exists: the "duration of the risk"; the "nature and severity of the potential harm"; the "likelihood that" this harm will arise; and the "imminence" of the harm. 29 C.F.R. § 1630.2(r)(1)–(4). Employers also should engage in an "individualized" direct-threat "assessment" and base their conclusion on "reasonable medical judgment," "the best available objective evidence," or both. *Id.* § 1630.2(r); *see Michael*, 808 F.3d at 307.

These criteria all point in one direction here: Smith qualified as a direct threat of harm to himself and others as a bucket foreman. Consider the four regulatory factors. If Smith had a seizure as a bucket foreman, it could cause the most "sever[e]" of "harm[s]": death. 29 C.F.R. § 1630.2(r)(2). Smith worked in an "inherently dangerous" role fixing live powerlines often in extreme weather. Undisputed Facts, R.22, PageID 713. All linemen, including bucket foremen, "risk[ed] electrocution, explosions, breakages, and other conditions that can cause serious injury or death." *Id.* Smith himself admitted that "lack of attention to detail or not being aware could

kill someone[.]"  Smith Dep., R.17-1, PageID 116.  And Smith's neurologist told him that his seizures (and thus this risk) may never go away.  *Id.*, PageID 128; *see* 29 C.F.R. § 1630.2(r)(1).

When dealing with such an enduring risk of extreme harm, an employer need not show a high "likelihood" or "imminence" of the risk being realized.  29 C.F.R. § 1630.2(r)(3)–(4); *see Wurzel*, 482 F. App'x at 19.  As Learned Hand once put it in the tort context, when the "gravity" of the potential harm increases, the "probability" that it will come about will decrease before a reasonable person would act to reduce the risk.  *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947).  Regardless, Smith's own doctor suggested that "sleep deprivation" and "physical exhaustion" could trigger seizures in the future.  Letter, R.17-1, PageID 142.  And Smith testified that his job regularly required him to work for 24 hours straight and routinely left him "exhausted."  Smith Dep., R.17-1, PageID 109, 122, 133.  These facts made it likely (not speculative) that Smith would suffer more seizures if he stayed on as a bucket foreman.

An "individualized assessment" of the medical and real-world evidence bolsters the conclusion that Smith posed a direct threat.  29 C.F.R. § 1630.2(r); *see Michael*, 808 F.3d at 307.  As for the medical evidence, every doctor who evaluated Smith supported the conclusion that he created a risk of harm in the bucket-foreman role.  No doctor opined that Smith could go back to this role as if nothing had changed.  To the contrary, Smith's own doctor suggested that he could perform the job only if Newport Utilities gave him an "accommodation" that capped his hours.  Letter, R.17-1, PageID 142.  Next, Dr. Bishop eventually suggested that he could perform the job only if the company eliminated the position's standby and overtime requirements.  Rep., R.17-1, PageID 156.  Lastly, Smith's neurologist identified similar work restrictions when helping Smith apply for disability benefits.  Statement of Disability, R.17-1, PageID 151–55.

As for the real-world evidence, Smith's on-the-job "conduct" confirms the same.  *Michael*, 808 F.3d at 309.  During one seizure, he swerved his truck so far out of the lane that a concerned coworker reported the episode.  And although the parties have debated whether Smith suffered another seizure months later, all agree that he collapsed while a coworker was in a bucket in the air.  All also agree that Smith has suffered many more seizures since his retirement.

In response, Smith faults the district court for relying on his post-retirement seizures and the neurologist report in his disability-benefits application because Frisbee did not know of this information when she forced him to retire. But we need not decide whether an employer must know of direct-threat evidence before courts may rely on it. Even if we consider only the evidence that Frisbee had in front of her, that evidence left no doubt that Smith would pose a "significant risk" of harm if he continued as a bucket foreman. 42 U.S.C. § 12111(3).

## 2. Reasonable Accommodations

Recall, however, that the ADA defines "direct threat" as "a significant risk to the health or safety of others *that cannot be eliminated by reasonable accommodation*." *Id.* (emphasis added). And recall that the ADA defines "qualified individual" to include one who can perform a job's "essential functions" with a "*reasonable accommodation*[.]" *Id.* § 12111(8) (emphasis added). So Smith next argues that if Newport Utilities had given him a reasonable accommodation, he would have no longer posed a "direct threat" of harm and would have become a "qualified individual." The ADA makes clear that a reasonable accommodation "may include" "modified work schedules" as well as "reassignment to a vacant position[.]" *Id.* § 12111(9)(B). Smith seeks both alternatives: he argues that Newport Utilities should have given him a modified work schedule for his bucket-foreman position or at least transferred him to another position.

*Modified Work Schedule*. Smith first asserts that Newport Utilities could have allowed him to remain as a bucket foreman if it had granted Dr. Bishop's proposed accommodation. She opined that Smith could return to this role if the company eliminated the requirement that he perform "standby work" and if it limited him to "40 hours per week." Rep., R.17-1, PageID 156. Yet our caselaw and agency regulations both clarify that this type of modified schedule cannot qualify as a reasonable accommodation if the changes would eliminate an *essential function* of the job. *See Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020); *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761–62 (6th Cir. 2015) (en banc); 29 C.F.R. § 1630.2(o)(1)(ii). In that event, the disabled individual would no longer meet the definition of "qualified individual." *See Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998); 42 U.S.C. § 12111(8).

What is an "essential" job function?  As a matter of both ordinary and regulatory meaning, a "function" qualifies as "essential" if it represents a "fundamental" rather than a "marginal" part of the job.  29 C.F.R. § 1630.2(n)(1); *see* 5 *Oxford English Dictionary* 402 (2d ed. 1989).  At the same time, judges and juries do not get to decide this fact question in the abstract.  *See Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 525 (6th Cir. 2021).  Rather, the ADA compels them to "consider[]" an "employer's judgment as to what functions of a job are essential[.]"  42 U.S.C. § 12111(8).  It adds that "if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  *Id.*; *see Ford*, 782 F.3d at 761–62.  Apart from that job description, many other potentially relevant "factors" demonstrate the fact-bound nature of the inquiry.  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 418 (6th Cir. 2021); *see Thompson*, 985 F.3d at 525.  For example, can the employer "distribute[]" the "performance" of the relevant function among only a "limited number of employees"?  29 C.F.R. § 1630.2(n)(2)(ii).  And would the disabled employee's failure to perform the function have negative "consequences"?  *Id.* § 1630.2(n)(3)(iv).

Here, then, we must consider whether overtime and standby work qualify as "fundamental" parts of the bucket-foreman position.  29 C.F.R. § 1630.2(n)(1).  They do.  To start, the factors that the ADA tells us to consider both point in that direction.  According to the "judgment" of Newport Utilities, bucket foremen must be able to perform nonroutine work.  42 U.S.C. § 12111(8).  Because utility companies cannot "predict when the storms are going to come," the employees responsible for repairing downed lines must "work numerous hours" on short, unexpected notice.  Frisbee Dep., R.25-4, PageID 529–30.  The "written [job] description" for this role confirms that conclusion.  42 U.S.C. § 12111(8).  It identifies the essential functions as, among other things, "[w]ork on standby rotation and be available to work during emergency power restoration" and be "[s]ubject to overtime on short notice."  Job Description, R.17-1, PageID 139.

Other evidence leads to the same result.  Even Smith conceded that his job required him to perform a "substantial amount" of overtime at "unpredictable" intervals.  Smith Dep., R.17-1, PageID 119.  He likewise recognized why employees must work standby: since something

"could happen" at any time, the company had to be ready if, say, a "car hit a pole" and blew out a "transformer" in the middle of the night. *Id.*, PageID 107. If he did not accept this duty, other employees would have to take on more standby work. *See id.*, PageID 112. Yet the company had "only three bucket foremen," Undisputed Facts, R.22, PageID 712, so it could shift this duty onto only a "limited number" of similar employees, 29 C.F.R. § 1630.2(n)(2)(ii). And if the bucket foremen and other linemen did not perform this standby and overtime work, the "consequences" could be dire because the community's power would remain out. *Id.* § 1630.2(n)(3)(iv). We thus suspect that most of the company's customers would agree that Smith performed perhaps his most critical role during his many hours of standby work: he turned their lights back on.

Smith responds that Newport Utilities permitted employees to ask coworkers to cover their standby or overtime work and did not punish them for not returning the company's calls during an emergency. Yet he ignores that employees avoided discipline for missing a standby or overtime shift only "[a]s long as [the shift] got covered[.]" Williamson Dep., R.22-4, PageID 439. Besides, the company's decision to allow coworkers to *voluntarily* "take care" of each other does not mean that the company must *compel* Smith's coworkers to take on this extra work. Smith Dep., R.17-1, PageID 112. As we said when rejecting another proposed accommodation of a 40-hour work week, the ADA does not force employers to shift work onto other employees in this way. *See Wyatt*, 999 F.3d at 419; *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632–33 (6th Cir. 1999).

*Alternative Positions*. Smith next asserts that Newport Utilities could have accommodated his disability by transferring him. To show that a reassignment would qualify as a "reasonable accommodation," an employee must have "requested" either a transfer to a specific "position" or "specific assistance" to identify available positions. *Fisher*, 951 F.3d at 419 (quoting *Burns v. Coca-Cola Enters. Inc.*, 222 F.3d 247, 258 (6th Cir. 2000)). If the employee notifies the employer of this willingness to transfer, the employer must try to find an open position that the employee could perform. *See Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 371–72 (6th Cir. 2024). But the employer need not eliminate the essential functions of open positions, fire other employees to manufacture such openings, or create new positions. *See id.*

Instead, employees must show that an open position existed and that they qualified for it to overcome an employer's summary-judgment motion. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007).

Here, Smith cites no evidence suggesting that he ever said anything to Newport Utilities that would have alerted the company that he might want to transfer. This omission may well doom his claim that the company should have accommodated his disability by reassigning him. *See Burns*, 222 F.3d at 258. But we need not resolve the claim on these grounds because Frisbee did, in fact, investigate whether Smith qualified for any unfilled jobs. When the company forced him to retire, Frisbee identified four open positions: two lineman positions, a wastewater-maintenance position, and a customer-service position. But the first three positions required the standby and overtime work that Smith could not perform. And the customer-service position required computer skills that Smith did not possess. So Smith did not qualify for any position.

Smith disagrees with Frisbee's assessment that he was not qualified. Yet his paragraph of conclusory reasoning fails to create a genuine issue of material fact. *See* Appellant's Br. 27–28. For the first three positions, Smith reraises the claim that overtime and standby work were not essential because employees could swap such shifts and did not face discipline if they missed a call from the company. That claim fares no better for these positions than it did for the bucket-foreman role. Smith also does not dispute that the customer-service position "required" employees to use a computer as an essential part of their job. Undisputed Facts, R.25, PageID 496. He instead argues that bucket foremen used a computer too. But Smith had told Frisbee "many times [that] he's not good on the computer [and] doesn't use it." Frisbee Dep., R.25-4, PageID 547. And no evidence suggests that the minimal computer skills necessary for the bucket-foreman job sufficed for the "highly computerized" customer-representative position. *Id.*, PageID 544.

### 3. Interactive Process

If an employee with a disability requests a change to work duties, a regulation suggests that an employer should "initiate an informal, interactive process" to identify "the precise limitations resulting from the disability and potential reasonable accommodations that could

overcome those limitations." 29 C.F.R. § 1630.2(o)(3). Although the ADA itself does not contain this requirement, we have held that employers must interact in good faith. *See Kleiber*, 485 F.3d at 871. Yet we have added that the failure to discuss accommodations does not qualify as a standalone ADA violation. *See Ford*, 782 F.3d at 766. Rather, employees must show that the discussions would have revealed a plausible reasonable accommodation that the employer overlooked. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 331–32 (6th Cir. 2023). And if an employee's formal lawsuit has failed to reveal any reasonable accommodations, those informal discussions would not have done so either. We thus refuse to hold an employer liable for failing to interact with the employee before the litigation unless the employee identifies a valid reasonable accommodation during the litigation. *See Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017). And here, Smith did not identify any reasonable accommodations that Newport Utilities could have made. So his claim that the company violated its duty to interact also fails.

\* \* \*

Smith provided Newport Utilities with thirty years of dedicated service. Perhaps it is debatable whether, as a moral matter, the company could have treated this reliable employee better. But it is not debatable that the company's treatment of Smith sufficed as a legal matter. Smith's seizures posed a safety threat that barred him from continuing as a bucket foreman. And he has not identified any other open positions that he was qualified to perform.

We affirm.