NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0069n.06

No. 25-1411

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Feb 03, 2026
KELLY L. STEPHENS, Clerk

ROBERT KOSCIELSKI,

    Plaintiff-Appellant,

v.

DDP SPECIALTY ELECTRONIC
MATERIALS US, INC.,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

OPINION

Before: GIBBONS, LARSEN, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. For over twenty years, Robert Koscielski provided excellent service to DDP Specialty Electronic Materials (and its predecessors). Yet after he started to suffer from difficulties with his balance, a neurologist diagnosed him with a rare brain condition. During the months that Koscielski was figuring out the source of his problems, DDP created a restructured role for him with many work restrictions. When his doctor told DDP that these restrictions would be permanent, though, DDP concluded that it could no longer accommodate him. It thus let him go. Koscielski sued, contending that DDP violated Michigan's Persons with Disabilities Civil Rights Act. To succeed, Koscielski needed to show that his condition was "unrelated to" his "ability to perform" his job. Mich. Comp. Laws § 37.1103(d)(i)(A). In other words, the Act's protections apply only if he could still perform his job duties—at least with an "accommodation" from DDP. *Id.* § 37.1103(l)(i). But undisputed evidence showed that Koscielski could not complete the duties of his current job (or other jobs for which he applied). Koscielski instead

claims that DDP had a legal obligation to continue to allow him to serve in the special role that it designed for him. But this atextual argument would hurt employees more than help them. It would discourage employers from temporarily exceeding the Act's minimum protections out of fear that a court would require them to permanently follow their temporary solution. Nothing in the Act calls for that result. So the district court correctly granted summary judgment to DDP. We affirm.

I

DDP Specialty Electronic Materials and its predecessors (Dow Chemical and DowDuPont) have long operated a large chemical facility in Midland, Michigan. This facility has "multiple plants" that make different things. Koscielski Dep., R.20-2, PageID 138. Some plants make "ion exchange" beads. *Id.*, PageID 142. Ions are atoms with either a positive electric charge (a "cation") or a negative electric charge (an "anion"). *Id.*, PageID 140; *see* Ion, *Encyc. Britannica* (Aug. 28, 2019), https://academic.eb.com/levels/collegiate/article/ion/42688. Because positive and negative ions attract each other, companies can use cations to filter out anion "impurities" in liquids (and vice versa). Koscielski Dep., R.20-2, PageID 142. For example, a company that makes orange juice might filter the juice through ion-exchange beads to remove "excess bitterness." *Id.* Or companies might use the beads in water softeners that they sell to homeowners to filter hard water. The Midland facility had a cation plant, an anion plant, and a "special resins" plant for "specialized" products made in "smaller" volumes. *Id.*, PageID 139–40, 149.

For over twenty years, Robert Koscielski worked at the Midland facility. He started in 1998 as a "basic skills employee" who packed "jugs" of a pesticide. *Id.*, PageID 138–39. Less than two years later, he received a promotion to an "operator" position in the anion plant. *Id.*, PageID 140. There, three operators worked each shift. They rotated between two control-room roles and one "field" role. *Id.*, PageID 143–44. The control-room operators monitored the beads

on computers as they went from tank to tank. The field operator worked on the floor loading raw materials, taking samples, making repairs, and performing similar tasks.

In 2008, Koscielski became an operator in the special-resins plant. A single operator could run this plant given its smaller volumes. Yet DDP eventually employed three special-resins operators—one each to work daytime, afternoon, and overnight shifts so that the plant could continuously run. Koscielski says that these operators could at times negotiate with each other over their shifts. But they presumptively rotated between the shifts. One operator would work daytime shifts one week, afternoon shifts the next week, and overnight shifts the week after that.

Special-resins operators had "more responsibility" than anion operators because they worked by themselves. *Id.*, PageID 141, 144, 146–47. But they generally had the same duties: to process ion-exchange "beads through various chemical tanks to alter" their chemical composition. Huschke Decl., R.24-2, PageID 829. So like anion operators, they worked both in the "control room" watching computers and in "the field" performing "physical" tasks. *Id.*

DDP's official job description for a special-resins operator characterized the role as requiring "moderate physical capabilities." Description, R.20-4, PageID 262. Among other things, these operators had to "climb (stairs and ladders) to gain access to valves, tanks, silos, railcars, truck trailers, and vessels" for up to "50%" of the workday. *Id.* Koscielski, for example, explained that he would "use a ladder" to reach pipes that needed repair. Koscielski Dep., R.20-2, PageID 172. The operators also had "to lift 50 lbs." Description, R.20-4, PageID 262. Koscielski again explained that he would dump packages that could weigh "55 pounds" into tanks. Koscielski Dep., R.20-2, PageID 164, 166. They also had "to bend, squat, and work in various body positions" for many duties. Description, R.20-4, PageID 262. So Koscielski described how he would bend and squat to pour materials into tanks whose lids sat at ground level. Apart from

these physical demands, the operators also had to know how "to drive a fork truck" around the plant. *Id.* Koscielski agreed that he regularly drove a forklift, listing as one example his transport of pallets of "catalyst" to the plant's fifth floor. Koscielski Dep., R.20-2, PageID 162, 167, 176. Lastly, the operators had to be "[a]ble to wear a full face respirator and impervious protective clothing for up to 2 hours" while on the floor. Description, R.20-4, PageID 262. Koscielski noted that they might sometimes have to wear a "[s]elf-contained breathing apparatus" with an air tank (or an "SCBA") when handling certain chemicals. Koscielski Dep., R.20-2, PageID 148.

Koscielski performed these duties well from 2008 to 2020. But his health took a turn for the worse in December 2020 when he began "to lose [his] balance and coordination." *Id.*, PageID 178. Until then, Koscielski had lived an active lifestyle. He, for instance, had served as a reserve firefighter and played intramural ice hockey. He first noticed balance issues while playing hockey because he could not stand on the ice without falling. In February 2021, he reported his condition to DDP's clinic, explaining that he had been experiencing vertigo and nausea for two months and that it was getting worse. By the next month, he struggled with his balance "[e]verywhere." *Id.*, PageID 179, 181. He had "to put [his] hands out" to avoid running into walls and felt "like the wall [was] a magnet" for him. *Id.*, PageID 179, 197.

On March 4, Koscielski reported his condition to DDP's clinic for a second time, explaining that he "continued" to have "balance and dizziness issues" that caused him to "cross[] . . . the centerline while driving" and "nearly fall[] over at work." Med. Rec., R.23-6, PageID 548. DDP's practitioner told Koscielski to see his physician to determine his ability to work. Five days later, Koscielski's physician told him to take a two-week leave to investigate the source of his dizziness.

This investigation proved challenging. Two weeks of leave turned into five months while doctors struggled to identify Koscielski's condition. An ear, nose, and throat doctor found that he tested negative for vertigo. A neurologist who ordered an MRI misdiagnosed him with an inoperable brain tumor. A second neurologist mistakenly thought he had suffered a stroke. As the summer of 2021 passed, Koscielski began to see Dr. Jeanie Cote, a third neurologist. Dr. Cote finally diagnosed Koscielski with his condition: "Central Pontine Myelinolysis" or "CPM"—a brain condition that affects balance and coordination. Koscielski Dep., R.20-2, PageID 131.

Koscielski received short-term disability benefits while on leave during this months-long ordeal. In August 2021, though, Dr. Cote sent DDP a note recommending that it permit Koscielski to return to work with restrictions. As for the restrictions, Cote suggested that Koscielski could not "work alone" or "go into [the] field alone" because of "the risk of falling." Cote Letter, R.23-12, PageID 584. She added that his balance difficulties did not allow him to "lift over 10" pounds and required him to "only work [the] day shift." *Id.* In short, Cote thought that Koscielski could "monitor" the production "process, at a desk while sitting." *Id.* Although Koscielski did not see Dr. Cote's note or learn of these restrictions until later, DDP's records show that its clinic informed Koscielski's "[s]ite" about them. Med. Rec., R.23-11, PageID 582.

Given the restrictions, Koscielski "didn't consider [himself] a special resins operator" when he returned to work in August "because [he] wasn't doing the job." Koscielski Dep., R.20-2, PageID 186. He could not work nights, climb ladders, lift heavy objects, drive forklifts, or wear an SCBA. The employee who had covered Koscielski's duties while he took leave remained in this role. And Koscielski switched to a "restructured" job for the next seven months. Appellant's Br. 6. On his first day back, his boss told him to "sit in the corner" and "work on the computer" because he did not want Koscielski leaving the control room. Koscielski Dep., R.20-2, PageID

184. He later undertook "maintenance planning," developed "procedures for training," and created "learning guides." *Id.*, PageID 184, 186, 192, 221. By 2022, he also went "in the field" at times for maintenance work (despite Dr. Cote's restrictions). *Id.*, PageID 189, 192. During these months, DDP remained unsure whether his restrictions would last indefinitely—although it knew that they "may" end up that way. Med. Rec., R.23-10, PageID 580.

In March 2022, Koscielski's new supervisor, Justin Huschke, sought clarification from DDP's health clinic about Koscielski's restrictions. The clinic relayed Dr. Cote's restrictions from the prior August. It also recommended that Huschke continue to follow these restrictions until a follow-up appointment that Koscielski had scheduled with Dr. Cote in May 2022.

Dr. Cote sent an updated list of restrictions that June. She largely confirmed the existing limits. Koscielski could work only day shifts. He also could not lift heavy objects, bend or squat, climb ladders, drive a forklift, use basic tools, or wear a full-face respirator. Notably, Cote added for the first time that Koscielski would *permanently* need these restrictions. DDP's clinic shared Cote's letter with Koscielski, Huschke, and its human-resources team and explained that it would hold an "interactive reasonable accommodation review" soon. Med. Rec., R.20-11, PageID 323.

DDP held this review in September 2022. Koscielski, Huschke, and employees from DDP's human-resources and medical teams attended. The group discussed Koscielski's medical condition and its effects on his ability to do his job. Based on Dr. Cote's restrictions, DDP concluded that Koscielski could not perform as a special-resins operator. Koscielski did not request any accommodations. And besides, DDP decided it could not accommodate Koscielski without causing undue hardship. So the company told Koscielski that he should apply for long-term disability benefits and that their employment relationship would end when he obtained them.

Yet DDP later instructed Koscielski not to report to work after October 31 while his application for those benefits remained pending, though it did not formally terminate him until December.

In the meantime, Koscielski tried to save his employment at DDP in two ways. He first asked Dr. Cote to reduce his work restrictions. She sent a new letter lifting Koscielski's limits on using hand tools, stairs (but not ladders), and respirators (but not SCBAs). DDP considered the revised restrictions. Yet it decided that it still lacked "any open positions that would accommodate" them. Email, R.20-16, PageID 352.

Koscielski next applied for three other open positions: two "technical advisor" jobs and one "engineer" job. Koscielski Dep., R.20-2, PageID 209, 213–14. DDP did not hire Koscielski for those jobs either. The engineer job required an engineering degree that Koscielski did not possess. And the technical-advisor jobs had many of the same physical requirements as a special-resins operator. Out of options, DDP let Koscielski go in December 2022.

A few months later, Koscielski sued DDP in Michigan state court under Michigan's Persons with Disabilities Civil Rights Act. He alleged that DDP violated the Act in two ways: both by failing to accommodate his disability and by discriminating against him because of it. DDP removed the case to federal court based on diversity jurisdiction. *See* 28 U.S.C. §§ 1332(a)(1), 1446(a).

After discovery, the district court granted summary judgment to DDP on both claims. *See Koscielski v. DDP Specialty Elec. Materials US, Inc.*, 2025 WL 952474, at *9 (E.D. Mich. Mar. 28, 2025). The court held that Koscielski failed to present enough evidence from which a reasonable jury could find that he could perform his job duties with or without an accommodation. *Id.* at *8. He thus did not qualify as disabled under the Act. *Id.* at *6–7. We review the grant of summary judgment de novo. *See Smith v. Newport Utils.*, 129 F.4th 944, 948 (6th Cir. 2025).

II

Michigan's Persons with Disabilities Civil Rights Act imposes two types of prohibitions on employers. First, employers may not "discriminate against" an employee "because of" the employee's disability. Mich. Comp. Laws § 37.1202(1)(b); *see Peden v. City of Detroit*, 680 N.W.2d 857, 863 (Mich. 2004). The Act thus does not permit an employer to "[d]ischarge" or "refuse to hire" a disabled individual "because of" the disability as long as it "is unrelated to the individual's ability to perform the duties of" the job. Mich. Comp. Laws § 37.1202(1)(a)–(b). Second, employers may not refuse to "accommodate" a disabled individual when the accommodation would allow the individual "to perform the specific requirements of the job" unless it "would impose an undue hardship." *Id.* §§ 37.1102(2), 37.1202(1)(f)–(g); *see Rourk v. Oakwood Hosp. Corp.*, 580 N.W.2d 397, 399 (Mich. 1998). The Act thus does not permit an employer to "[d]ischarge" or "refuse to hire" a disabled individual if the individual could perform the job with "adaptive devices or aids" unless allowing those devices or aids "would impose an undue hardship" on the employer. Mich. Comp. Laws §§ 37.1202(1)(f)–(g), 37.1210(1).

To assert either a discrimination or an accommodation claim, employees must initially prove that they suffer from a "disability" within the meaning of the Act. Mich. Comp. Laws §§ 37.1102, 37.1202. And the Act defines "disability" in a unique way. *See id.* § 37.1103(d). For purposes of the Act's employment protections, employees must establish two things to prove that they have a disability. An individual must have a "physical or mental characteristic" that "substantially limits 1 or more of [the individual's] major life activities[.]" *Id.* § 37.1103(d)(i)(A). And that physical or mental characteristic must be "unrelated to the individual's ability to perform the duties of a particular job or position" (if the individual has already been hired) or "unrelated to the individual's qualifications for employment" (if the individual seeks a job). *Id.* The Act later

defines the phrase "[u]nrelated to the individual's ability" to mean that the relevant mental or physical impairment "does not prevent the individual from . . . performing the duties of a particular job or position," "with or without accommodation." *Id.* § 37.1103(l)(i). Put together, these statutory definitions mean that the Act prohibits discrimination and requires an accommodation only if (despite any impairments) an individual may undertake "the duties of a particular job" either with or without an accommodation for the disability. *Peden*, 680 N.W.2d at 863.

Koscielski has asserted both discrimination and accommodation claims. He argues that DDP terminated him as a special-resins operator and refused to hire him as a technical advisor because of his CPM. And he argues that DDP failed to accommodate his CPM. To succeed on either claim, though, Koscielski must show that his CPM qualified as a "disability" under the Act. DDP agrees that the condition was a "physical or mental characteristic" that "substantially limit[ed] 1 or more of [his] major life activities[.]" Mich. Comp. Laws § 37.1103(d)(i)(A). But Koscielski also needs to show that the CPM was "unrelated to [his] ability to perform the duties of" a special-resins operator and "unrelated to [his] qualifications for employment" as a technical advisor. *Id.* That is, he needs to show that his CPM did "not prevent [him] from . . . performing the duties of" these two jobs ("with or without accommodation"). *Id.* § 37.1103(l)(i).

To resolve Koscielski's claims, then, we must ask two questions. *See Peden*, 680 N.W.2d at 871–72. What were the "duties" of these jobs? *Spraggins v. Third Jud. Cir. of Mich.*, 2020 WL 3621293, at *3 (Mich. Ct. App. July 2, 2020) (per curiam). And could Koscielski perform those duties (either with or without an accommodation from DDP)? *See id.* at *4.

## A. What Were Koscielski's Job Duties?

Unlike the Americans with Disabilities Act and its implementing regulations, Michigan's disability law does not give instructions on how to identify the "duties" of a job. *Compare Peden*,

680 N.W.2d at 864–65 (federal law), *with id.* at 870 (state law). Yet the Michigan Supreme Court has provided guidance on this topic. It has held that courts must give "substantial deference" to an employer's judgment about the "scope" and "duties" of a job. *Id.* at 871. Although that judgment is not "dispositive," a plaintiff must introduce "sufficient evidence" that the employer unreasonably identified the duties to overcome this deference. *Id.* at 871–72.

Because we owe "substantial deference" to DDP's view, we start with its descriptions of special-resins operators and technical advisors. *Id.* at 871. As for special-resins operators, DDP's official job listing explained that they are "responsible and accountable for the safe and efficient operation" of the special-resins "complex." Description, R.20-4, PageID 261. And it lists a variety of "[p]hysical requirements" for the job's day-to-day duties. *Id.*, PageID 262. Among other things, these operators must be able to "climb (stairs and ladders)," "lift 50" pounds, "drive a fork truck," "bend, squat, and work in various body positions," "use basic tools," "provide coverage on" "evenings" and "nights," and "wear a full face respirator" (including "an SCBA"). *Id.*

As for technical advisors, DDP's official job listing explained that this role would provide "operational expertise" and "technical, mechanical, and hands-on assistance for the safe operation" of the anion and special-resins plants or the cation plant. Application, R.20-22, PageID 405; *see* Application, R.20-20, PageID 384. And the listing identified many of the same "[p]hysical requirements" as the one for special-resins operators. Application, R.20-22, PageID 406–07. Technical advisors had to "[c]limb stairs" and ladders, push and pull large amounts of weight, "[b]end, squat and work in various body positions," "[d]rive a fork truck," and wear protective gear (including an "SCBA and respirators"). *Id.*; Application, R.20-20, PageID 385–86.

Koscielski thus bears the burden to present "sufficient evidence" from which a rational jury could find that DDP unreasonably described the required duties. *Peden*, 680 N.W.2d 871–72. He

has not done so. Indeed, the other evidence all confirms (rather than refutes) DDP's description. To start, Koscielski testified that he engaged in all the physical requirements that DDP listed for special-resins operators before he began to struggle with his balance. He would regularly use ladders. He would regularly lift heavy packages of materials and squat and bend to dump materials into tanks. He would regularly move pallets around the plant with a forklift. He would regularly work night shifts. And he would regularly wear an SCBA when dealing with certain chemicals.

Other evidence confirmed his testimony. Huschke, Koscielski's boss, opined that the job description accurately listed the position's duties. Koscielski's former co-workers did too. And DDP identified the same duties on the form filled out during Koscielski's interactive reasonable accommodation review. Koscielski also admitted that the job functions on this form were "associated with a . . . special resins operator position[.]" Koscielski Dep., R.20-2, PageID 200.

In response, Koscielski argues this case as if he brought a federal ADA claim rather than a state-law claim. He points out, for example, that the ADA requires a disabled individual to perform only the "essential functions" of a job and cites federal regulations offering instructions on how to determine those functions. *See* Appellant's Br. 20–21 (quoting 29 C.F.R. § 1630.2(n)). But the Michigan Supreme Court has "caution[ed] against simply assuming" that Michigan's Persons with Disabilities Civil Rights Act follows the same standards as the ADA. *Peden*, 680 N.W.2d at 870. While, for example, the ADA asks whether a disabled individual can perform a job's "*essential* functions," 42 U.S.C. § 12111(8) (emphasis added), the Michigan law asks only whether the individual can perform the job's "duties," Mich. Comp. Laws § 37.1103(d)(i)(A). True, the Michigan Supreme Court has asked whether job functions were "essential" when analyzing ADA and state-law disability claims together. *Peden*, 680 N.W.2d at 872–73. But it has not adopted the essential-function framework found in the ADA regulations. On the contrary, the court has

questioned the validity of these regulations even in the ADA context, so it has refused to "accept" those regulations "as dispositive" when interpreting the Michigan law. *Peden*, 680 N.W.2d at 871; *see id.* at 865 n.11. It has instead reiterated (more than the regulations do) that courts must give "substantial deference" to an employer's descriptions of a job. *See id.* at 871.

Koscielski next argues that DDP mischaracterized the duties of a special-resins operator because it allowed him to work "for over fifteen (15) months" without performing many of those duties (such as driving a forklift, working night shifts, or wearing an SCBA). Appellant's Br. 21. This claim gets both the facts and the law wrong. Beginning with the facts, Koscielski's duties from August 2021 to October 2022 were *not* the duties of a special-resins operator. Rather, Koscielski "work[ed] on procedures," "learning guides," and the like. Koscielski Dep., R.20-2, PageID 221. DDP relied on three *other* special-resins operators (including a replacement) to "r[u]n the place," and Koscielski merely assisted them. *Id.*, PageID 186, 220. So he "didn't consider [himself] a special resins operator, because [he] wasn't doing the job." *Id.*, PageID 186. His duties during this time, then, tell us nothing about what duties special-resins operators must perform.

Turning to the law, Koscielski mistakes DDP's *voluntary* choice to accommodate him for a *legally compelled* decision. Like the ADA, Michigan's Persons with Disabilities Civil Rights Act provides *minimum* protections to disabled individuals: employers must not discriminate against them if they can perform a job's duties with accommodations. *See Peden*, 680 N.W.2d at 863. Yet the Act provides a floor, not a ceiling. So even when valuable disabled employees (like Koscielski) cannot perform their job duties, employers may go beyond the Act's protections by finding a role for them. And the Act does not punish an employer's generosity by raising the standard for accommodations to match these past practices. *See id.* at 869 & n.18; *cf. Wagner v. Sherwin-Williams Co.*, 647 F. App'x 645, 650 (6th Cir. 2016); *Banks v. Brown-Forman Corp.*, 84

F. App'x 625, 626–27 (6th Cir. 2003) (order). DDP took this path here—at least for a time. As a human-resources employee testified, DDP accommodated Koscielski's disability "out of compassion" because they were "hoping that he would recover" and return to his role. Skiver Dep., R.20-12, PageID 328. And DDP did not need to "fear" that its decision to accommodate Koscielski by allowing him to avoid many of his regular duties would make it liable to provide this more generous protection permanently. *Peden*, 680 N.W.2d at 869 n.18.

Koscielski responds that he "informed" DDP's medical team and his boss when he returned to work in August 2021 that his condition would be permanent. Koscielski Dep., R.20-2, PageID 219. This fact, he argues, undercuts any claim that it gave him only a temporary accommodation. But Dr. Cote's notes to DDP listing his work restrictions did not identify them as permanent until June 2022. *Compare* Cote Letter, R.23-12, PageID 584, *with* Cote Letter, R.20-10, PageID 321. Back in August 2021, Koscielski's medical records at DDP suggested that the company knew only that the condition "may be permanent." Med. Rec., R.23-10, PageID 580. Besides, we fail to see why this debate matters. Even if he told DDP that his condition was permanent, the Act still would not have required the company to indefinitely permit him to avoid his job's duties.

Koscielski lastly claims that courts may not identify a job's duties at the summary-judgment stage because this factual question "typically" belongs to the jury. Appellant's Br. 21 (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014)). This claim has many problems. For starters, Koscielski's cites an ADA case (*Rorrer*) as support. *See* 743 F.3d at 1038–39. Yet again, the Michigan Supreme Court does not reflexively follow the ADA when interpreting Michigan's disability law. *See Peden*, 680 N.W.2d at 870. Besides, we do not (and could not) have any hard-and-fast rule in ADA cases that would bar courts from determining a job's duties as a matter of law at the summary-judgment stage. *See EEOC v. Ford Motor Co.*, 782

F.3d 753, 765–66 (6th Cir. 2015) (en banc). After all, the summary-judgment stage exists to weed out certain *fact* questions from a jury's consideration—those in which "there is no genuine dispute" as to the answer. Fed. R. Civ. P. 56(a). And here, every "rational trier of fact" would find that DDP reasonably identified the duties of a special-resins operator and technical advisor. *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (citation omitted).

### B. Could Koscielski Perform the Job Duties?

After we identify a job's duties, we must consider whether an employee could perform the duties "with or without an accommodation." *Spraggins*, 2020 WL 3621293, at *4. And Koscielski again bears "the burden of raising a genuine issue of material fact" over whether he could perform the duties of a special-resins operator or technical advisor. *Peden*, 680 N.W.2d at 872. But we again find the record undisputed that Koscielski could not perform all duties of either position.

First consider his ability to complete the duties of a special-resins operator. Koscielski expressly admitted that DDP had to hire a replacement special-resins operator because he could not perform many of that job's duties. He, for example, could not climb ladders, bend or squat without help, work at night, drive a forklift, or wear an SCBA. Dr. Cote's letters bolster this conclusion because they confirmed that Koscielski could not perform these duties. As she described matters, he could not "go into [the] field alone" or "lift over 10" pounds, and instead he could "only work day shift" while sitting at a desk. Cote Letter, R.23-12, PageID 584. DDP could reasonably take Dr. Cote's restrictions "at face value," even if Koscielski had a different view of his "physical prowess." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 986 (6th Cir. 2011) (citation omitted); *see Peden*, 680 N.W.2d at 872.

Next consider Koscielski's ability to complete the duties of a technical advisor. Although an advisor had a different focus than a special-resins operator, the job included some of the same

14

"[p]hysical requirements" that Koscielski could not perform. Application, R.20-22, PageID 406–07. He, for example, could not drive a forklift or wear an SCBA—two requirements for technical advisors. In sum, Koscielski's CPM was "[]related to" his "ability to perform the duties of" a special-resins operator and technical advisor. Mich. Comp. Laws § 37.1103(d)(i)(A). So it was not a "disability" under Michigan law.

Koscielski's arguments on this second question fare no better. *First*, he identifies a few special accommodations that he developed on his own to help him perform his revised role. For example, although he could not climb a regular ladder, he would sometimes use one "with handrails and wider feet." Appellant's Br. 25. And although he could not lift heavy materials, he would have another employee put the materials in an appropriate place where he could "use a five-gallon bucket to" scoop them into a tank. *Id.* Likewise, Koscielski said he did not need to work overnight because he had previously negotiated with another special-resins operator to take that shift indefinitely. *Id.* at 26. We doubt that this evidence shows that he could perform his climbing, lifting, and scheduling duties. Still, we need not consider the point. He has proposed no workable accommodations for several *other* duties of special-resins operators and technical advisors, including the requirement to drive a forklift and wear a SCBA.

*Second*, Koscielski argues that he could perform his "restructured" job. Appellant's Br. 25–26. But an employer has a potential obligation to restructure only the "minor or infrequent duties" of a job. Mich. Comp. Laws § 37.1210(15). An employer need not restructure the job's "primary" duties. *Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 770 (6th Cir. 2025). Nor must the employer "transfer" an employee to a different role. *Id.* (quoting *Rourk*, 580 N.W.2d at 400). These principles doom Koscielski's reliance on his restructured role. When DDP created that role, it altered more than the "minor or infrequent duties" of a special-resins operator. Mich.

Comp. Laws § 37.1210(15). It instead created an altogether different job. And Koscielski's ability to perform "'some' job is not relevant[.]" *Peden*, 680 N.W.2d at 864 n.9. He instead had to prove that he could "perform *the* job he held": special-resins operator. *Id.* He could not. DDP also did not have to "create or offer" him "a new position as an accommodation" for his disability. *Pemberton*, 150 F.4th at 770. Its voluntary decision to do so for 15 months simply proves that it went over and above what Michigan law requires.

*Third*, Koscielski points to one piece of evidence suggesting that he could work as a "technical advisor." Appellant's Br. 23. When informing Koscielski that DDP had hired another person for one of the two technical-advisor roles, Huschke emailed him that "we felt that everyone could do the job" but that they hired the person "who could best deliver the type of results that" they needed. Email, R.23-21, PageID 813. Koscielski argues that this email creates a jury question over whether he could perform a technical advisor's duties. And he adds that DDP's failure to respond to this evidence undercuts its contrary claim. Still, Huschke's conclusory statement—in an email informing Koscielski that he did *not* get the job, no less—would not allow a "rational trier of fact" to find that Koscielski could perform the job's duties. *Viet*, 951 F.3d at 823 (citation omitted). As we have explained, DDP's official listing of a technical advisor's duties objectively showed that the job required many things that Koscielski could not do, such as drive a forklift and wear an SCBA. Many witnesses also confirmed that the job included these duties. Indeed, Huschke himself explained that, while Koscielski satisfied some of "the minimum requirements for that position," the "physical requirements of that job . . . mimic" a special-resins operator. Huschke Dep., R.20-3, PageID 239. So Huschke found him unqualified for that reason. *Id.*

*Fourth*, Koscielski argues that our cases deny "summary judgment for the employer" when a fact dispute exists over whether it conducted an adequate "interactive accommodation review

16

process." Appellant's Br. 26–27 (quoting *Ford*, 782 F.3d at 778 (Moore, J., dissenting)). This claim lacks merit. As an initial matter, Koscielski supports the claim with an ADA regulation. *See* 29 C.F.R. § 1630.2(o)(3). But again, the Michigan Supreme Court has said that ADA regulations are neither "binding authority" nor "dispositive" under Michigan law. *Peden*, 680 N.W.2d at 870–71. And Koscielski cites no statute, regulation, or case showing that this law contains the "interactive process" requirement that he invokes.

But we need not decide whether Michigan law contains this requirement. Even in the ADA context, Koscielski's argument would fail. We have not treated the failure to engage in this interactive process as a "standalone ADA violation." *Smith*, 129 F.4th at 953. Instead, a plaintiff must show that the parties would have found a reasonable accommodation if they had engaged in that process. *See id.* And Koscielski failed to identify such an accommodation.

To support his conflicting claim that we must deny summary judgment based on an interactive-process failure, Koscielski mistakenly treats the *dissent* in our decision in *Ford* as the court's opinion. Appellant's Br. 27 (quoting *Ford*, 782 F.3d at 778 (Moore, J., dissenting)). Yet the majority in that case confirms our conclusion. It makes clear that we need not "consider" whether an employer "showed bad faith" in the "interactive process" whenever employees lack evidence from which a reasonable jury could find that they could perform a job's duties with an accommodation. *Ford*, 782 F.3d at 766. Koscielski lacks this evidence here.

We affirm.